William Lee THOMPSON,
Petitioner-Appellant,
Cross-Appellee,

v.

Louie L. WAINWRIGHT, Secretary, Florida Department of Corrections, Respondent-Appellee, Cross-Appellant.

No. 84–5815.

United States Court of Appeals,
Eleventh Circuit.

April 10, 1986.

Rehearing and Rehearing En Banc
Denied May 30, 1986.

Michael L. Von Zamft, Talburt, Kubicki, Bradley & Draper, Miami, Fla. (court-appointed), Diane E. Marger, Ft. Lauderdale, Fla., for petitioner-appellant, cross-appellee.

Jim Smith, Atty. Gen. of Fla., Calvin L. Fox, Asst. Atty. Gen. of Fla., Dept. of Legal Affairs, Miami, Fla., for respondent-appellee, cross-appellant.

Before GODBOLD, Chief Judge, KRAVITCH and HATCHETT, Circuit Judges.

KRAVITCH, Circuit Judge:

William Thompson, a prisoner of Florida, filed a petition for a writ of habeas corpus in the federal district court asking that his murder conviction and death sentence be set aside. After an evidentiary hearing the district court denied relief. We affirm.

### BACKGROUND

The Florida Supreme Court summarized the facts of the crime in deciding Thompson's direct appeal:

> The appellant Thompson, Rocco Surace, Barbara Savage, and the victim Sally Ivester were staying in a motel room. The girls were instructed to contact their homes to obtain money. The victim received only $25 after telling the others that she thought she could get $200 or $300. Both men became furious. Surace ordered the victim into the bedroom, where he took off his chain belt and began hitting her in the face. Surace then forced her to undress, after which the appellant Thompson began to strike her with the chain. Both men continued to beat and torture the victim. They rammed a chair leg into the victim's vagina, tearing the inner wall and causing internal bleeding. They repeated the process with a night stick. The victim was tortured with lit cigarettes and lighters, and was forced to eat her sanitary napkin and lick spilt beer off the floor. This was followed by further severe

beatings with the chain, club, and chair leg. The beatings were interrupted only when the victim was taken to a phone booth, where she was instructed to call her mother and request additional funds. After the call, the men resumed battering the victim in the motel room. The victim died as a result of internal bleeding and multiple injuries. The murder had been witnessed by Barbara Savage, who apparently feared equivalent treatment had she tried to leave the motel room.

*Thompson v. State,* 389 So.2d 197, 198 (1980).

Thompson and Surace both pled guilty and were sentenced to death, but these pleas and sentences were set aside by the Florida Supreme Court. *Thompson v. State,* 351 So.2d 701 (1977); *Surace v. State,* 351 So.2d 702 (1977). Upon remand, Thompson again pled guilty, and again was sentenced to death. The Florida Supreme Court affirmed, 389 So.2d 197 (1980); the state courts also denied collateral relief. 410 So.2d 500 (1982). Thompson then filed a petition for habeas relief in the federal district court raising numerous grounds. He subsequently sought to amend his petition to add claims based on ineffective assistance of counsel. Because these additional claims had not been presented to the Florida courts, the district court granted a continuance to allow Thompson to exhaust the claims in state court and the state appealed. This court affirmed the district court's continuance, but also stated that the district court, in its discretion, could have accepted the state's offer to waive exhaustion with respect to the new claims. *Thompson v. Wainwright,* 714 F.2d 1495 (11th Cir.1983), *cert. denied,* 466 U.S. 962, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984). On remand, the district court accepted the waiver, and, after an evidentiary hearing, found all of Thompson's claims without merit.

## I. INEFFECTIVE ASSISTANCE CLAIMS

Thompson contends that his counsel, Harold Solomon, was ineffective during entry of his second guilty plea and the sentencing proceeding. Solomon's representation of Thompson began after the first plea was set aside and continued through the state proceedings for collateral relief.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court articulated the standards for reviewing claims of ineffective assistance of counsel. The petitioner can prevail only if counsel's "acts or omissions were outside the wide range of professionally competent assistance," *id.,* 104 S.Ct. at 2066, and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068. The questions of whether counsel's performance was deficient, and whether the defendant was prejudiced by any deficiency are mixed questions of fact and law. 104 S.Ct. at 2070. The district court ruled that Solomon was not ineffective, and found that numerous of the alleged errors by Solomon resulted from Thompson's own actions.

### A. *Entry of the Guilty Plea*

In *Hill v. Lockhart,* —— U.S. ——, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985), the Court made clear that the *Strickland* standards apply to the assistance of counsel in entering a plea. The record here indicates that after the Florida Supreme Court vacated Thompson's first guilty plea, Thompson again decided to plead guilty, although Solomon discussed the ramifications of the plea with Thompson and told him that he was prepared to try the case. Nevertheless, Thompson contends that Solomon's assistance before and during the plea proceeding fell outside the wide range of professionally competent assistance, and that but for Solomon's ineffective assistance there is a reasonable probability that Thompson would have been found incompetent to enter a plea.

In *Strickland,* the Court noted that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

prejudice, which we expect will often be so, that course should be followed." 104 S.Ct. at 2070. With respect to the plea proceeding, petitioner's ineffectiveness claim falls into this category. Thompson contends that Solomon was aware that Thompson had mental difficulties, and yet allowed the plea proceeding to go forward. Although the record does indicate that Solomon believed his client had mental problems, such problems do not necessarily mean a defendant is incompetent to enter a plea; moreover Thompson has not identified anything Solomon could have done that would have changed the outcome of the plea proceeding. At the time Thompson was first charged in 1976, four psychiatrists examined him and all four found him competent to stand trial. Nevertheless, Solomon petitioned the court for a new examination to determine Thompson's competence, which request was denied. At the plea proceeding, Thompson brought the possibility of Thompson's incompetence to the trial judge's attention. After interrogating Thompson, the trial judge was satisfied with Thompson's competence to enter a plea. Because we are unaware of any further steps Solomon could have taken to prevent the guilty plea, or to convince the court that Thompson was incompetent, we hold that Thompson's claim of ineffective assistance of counsel at his plea proceeding fails under the prejudice prong of the *Strickland* test.

## B. *The Sentencing Hearing*

Thompson's claim of ineffective assistance at his sentencing hearing is more difficult. At this hearing the state called police officers, the medical examiner, the victim's mother, and most importantly, Barbara Savage, who related the details of the crime. Solomon did not call any witnesses. Thompson challenges many of Solomon's acts and omissions as falling "outside the

wide range of professionally competent assistance." *Strickland,* 104 S.Ct. at 2066. The district court ruled, however, that Solomon was greatly hindered by Thompson's own actions; specifically, Thompson directed Solomon not to investigate certain matters and refused to testify at the sentencing hearing. Thompson's actions affect both our analysis of whether Solomon was deficient, and whether any deficiencies meet the prejudice standard of *Strickland.*

### 1. *Failure to Investigate and Present Mitigating Evidence*

Thompson's significant allegations that Solomon was ineffective in the sentencing proceeding fall into three categories:[1] failure to investigate and present possible mitigating circumstances; failure to move for a continuance when Thompson refused to testify; the closing argument, which Thompson contends did more harm than good.

A criminal defense attorney has a duty to investigate, but this duty is limited to reasonable investigation. *Strickland,* 104 S.Ct. at 2066. Thompson alleged several areas of investigation ignored by counsel: among others, Solomon did not investigate the background of the codefendant Surace, and Solomon neither contacted the psychiatrists who had examined Thompson in 1976 nor considered offering the psychiatric reports into evidence. In these two respects, we agree that Solomon's performance was insufficient. In a capital case, where a defendant's life may well depend on the extent and nature of his participation, the background of a codefendant could be crucial. Here, one of Solomon's goals was to affix blame for the crime on Surace, and his failure to investigate Surace's background is, therefore, not understandable. Under the Florida capital statute, psychiatric expertise is relevant to certain statutory mitigating factors. *See* Fla.

---

1. Thompson complains of other aspects of Solomon's representation at the sentencing hearing, including his failure to object to admission of Surace's confession and his failure to object to comments the prosecutor made during closing which implied Thompson had the burden of proof on mitigating circumstances. We do not believe that any of the alleged errors of counsel played a role in the jury's consideration of aggravating and mitigating circumstances. Accordingly, we need not further consider these alleged errors.

Stat.Ann. § 921.141(6). Moreover, Solomon testified in the district court that he thought Thompson was retarded; hence his failure to contact the examining psychiatrists or make any other effort to present Thompson's limited mental capacity to the jury is inexplicable.[2]

■ Thompson also contends that Solomon was ineffective for failing to investigate Thompson's own background, including childhood and early family life, school records, and service records. Solomon, however, testified in the district court that Thompson directed him *not* to investigate his past. In *Strickland,* the Supreme Court noted the importance of the defendant's communications with his attorney in scrutinizing the attorney's decision whether to investigate. 104 S.Ct. at 2066. The Court stated that "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.* Nonetheless, Thompson contends that Solomon should not have heeded his request because Solomon was aware that Thompson was experiencing mental difficulties.

This court addressed a similar issue in *Mitchell v. Kemp,* 762 F.2d 886, 889–90 (11th Cir.1985). In *Mitchell,* counsel did not investigate a capital defendant's background, in part because the defendant directed him to leave his family "out of it." 762 F.2d at 889. Although the court found that counsel was not ineffective, it noted that the attorney did not blindly follow Mitchell's instructions: the attorney did not probe deeply into Mitchell's reasons for not wishing to involve his family, but did make an independent evaluation of character witnesses by an in-depth conversation with Mitchell. *Id.* at 890. The new Fifth Circuit also has held that although a capital defendant's stated desire not to use character witnesses does not negate the counsel's

duty to investigate, it limits the scope of the investigation required. *Gray v. Lucas,* 677 F.2d 1086, 1093–94 (5th Cir.1982), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983); *see also Martin v. Maggio,* 711 F.2d 1273, 1280 (5th Cir.1983) (defendant's "instruction that his lawyers obtain an acquittal or the death penalty did not justify his lawyer's failure to investigate the intoxication defense.... Uncounselled jailhouse bravado, without more, should not deprive a defendant of his right to counsel's better-informed advice."), *cert. denied,* —— U.S. ——, 105 S.Ct. 447, 83 L.Ed.2d 373 (1984).

The reason lawyers may not "blindly follow" such commands is that although the decision whether to use such evidence in court is for the client, *Foster v. Strickland,* 707 F.2d 1339, 1343 (11th Cir.1983) (lawyer bound by client's counselled decision to not rely on insanity defense), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984) the lawyer first must evaluate potential avenues and advise the client of those offering possible merit. Here, Solomon did not evaluate potential evidence concerning Thompson's background. Thompson had not suggested that investigation would be fruitless or harmful; rather, Solomon's testimony indicates that he decided not to investigate Thompson's background only as a matter of deference to Thompson's wish. Although Thompson's directions may have limited the scope of Solomon's duty to investigate, they cannot excuse Solomon's failure to conduct *any* investigation of Thompson's background for possible mitigating evidence. Solomon's explanation that he did not investigate potential mitigating evidence because of Thompson's request is especially disturbing in this case where Solomon himself believed that Thompson had mental difficulties. An attorney has expanded duties when representing a client whose condition prevents him from exercising proper judgment. *See* Code of Professional Responsibility EC

---

**2.** Although Solomon was ineffective for not contacting psychiatrists who had already examined Thompson, in the course of our discussion of Thompson's *Ake v. Oklahoma* claim, *see* note 8, *infra,* we consider and reject the possibility that Thompson was ineffective for not requesting court-appointed psychiatric assistance in developing mitigating evidence.

7–12 (Fla.Stat.Ann.1983).[3] We conclude that Solomon's failure to conduct any investigation of Thompson's background fell outside the scope of reasonably professional assistance.

Solomon's plan at the hearing was to elicit certain mitigating circumstances through cross-examination, call Thompson, who would express his remorse, and in closing, plead to the jury for mercy. Solomon testified, however, that when the time came for Thompson to take the stand, Thompson refused, stating that he was afraid of making a fool of himself before the jury. Solomon urged Thompson to testify, but Thompson was adamant. Two days later, Thompson did take the stand, at Surace's trial. There Thompson took the majority of blame for the torture-murder himself, deflecting blame from Surace.

The petitioner contends that when he refused to testify, Solomon should have moved for a continuance to determine the basis of his refusal. Although Thompson now claims that he refused to testify because of threats from Surace, according to Solomon, Thompson did not mention these threats until after the sentencing was complete; Thompson's explanation at the time was that he did not want to make a fool of himself. Solomon had prepared Thompson to testify, and he urged Thompson to do so. The ultimate decision whether to testify is for the defendant, and a defendant who rejects his lawyer's advice on such a matter may not later challenge the lawyer's effectiveness. *Foster v. Strickland*, 707 F.2d 1339, 1343 (11th Cir.1983). Faced with Thompson's sudden refusal to testify, Solo-

mon apparently made a decision to carry on with the remainder of his presentation. In light of Thompson's adamant position, Solomon's decision to go forward as best he could under the circumstances was not outside the bounds of reasonably professional assistance.

Our conclusion that aspects of Solomon's representation fell outside the range of reasonably professional assistance requires addressing the prejudice prong of the *Strickland* test. In discussing the showing a petitioner must make to obtain a new trial on the ground of errors by counsel, the Supreme Court specifically rejected an "outcome-determinative standard," 104 S.Ct. at 2068, under which the petitioner would have to prove by a preponderance of the evidence that the result would have been different had the petitioner been provided reasonably effective representation. Instead the Court set forth a standard under which:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* Thompson presented considerable evidence at the district court hearing. We must first consider what portion of this evidence could have been presented and argued at the sentencing hearing by a reasonably effective counsel, and then whether such evidence may have been persuasive to a jury. We also must review the evi-

---

**3.** Ethical Consideration 7–12 provides that:

Any mental or physical condition of a client that renders him incapable of making a considered judgment on his own behalf casts additional responsibilities upon his lawyer. Where an incompetent is acting through a guardian or other legal representative, a lawyer must look to such representative for those decisions which are normally the prerogative of the client to make. If a client under disability has no legal representative, his lawyer may be compelled in court proceedings to make decisions on behalf of the client. If the client is capable of understanding the matter in question or of contributing to the advance-

ment of his interests, regardless of whether he is legally disqualified from performing certain acts, the lawyer should obtain from him all possible aid. If the disability of a client and the lack of a legal representative compel the lawyer to make decisions for his client, the lawyer should consider all circumstances then prevailing and act with care to safeguard and advance the interests of his client. But obviously a lawyer cannot perform any act or make any decision which the law requires his client to perform or make, either acting for himself if competent, or by a duly constituted representative if legally incompetent.

dence actually presented to the sentencing jury, because a "conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 2069. If we are confident that the jury still would have concluded that the balance of aggravating and mitigating circumstances warranted death, then the petitioner cannot obtain relief. *Id.*

The evidence of Thompson's background presented to the district court consisted mostly of his Marine Corps and school records. The Marine Corps records indicate that Thompson was dishonorably discharged for a misrepresentation on his enlistment papers: he stated that he had not committed homosexual acts when in actuality he had a significant history of homosexual conduct. Thompson's elementary school records include grades, teacher comments, evaluations by the school psychologist, and intelligence test scores. They indicate that he was mildly retarded, had poor motor skills, had great difficulty in basic subjects of reading, writing and arithmetic, was hyperactive, and difficult.

Thompson also proffered the psychiatric evaluations prepared in 1976 and ignored by Solomon; these exhibits further document Thompson's troubled early years. They indicate Thompson left school in the ninth grade at the age of eighteen, that he had had difficulty getting along with his parents, and that he had been a drug abuser. All four psychiatrists who examined Thompson in 1976 concluded that he was sane at the time of the offense and that he was capable of assisting in his defense. This does not mean, however, that no psychiatric mitigating factors, statutory or nonstatutory, were indicated in the reports. Three of the psychiatrists diagnosed Thompson as having a personality disorder; the fourth questioned the extent of Thompson's participation in the crime due to possible intoxication and drug use.

Finally, Thompson contends that reasonable investigation of Surace would have revealed that Surace was involved with violent motorcycle gangs, had been convicted of intimidating a government witness, and at age fourteen had killed a playmate. In sum, reasonable investigation would have yielded evidence of Thompson's low intelligence and troubled past and the violent reputation of his codefendant.[4]

Even had the jury heard this evidence, however, we are confident that Thompson's sentence would have been the same. The jury's determination was strongly supported by the aggravating circumstances introduced in the record. Nothing Solomon could have presented would have rebutted the testimony concerning Thompson's participation in the brutal torture murder. The testimony indicated that although Surace initiated the beatings, Thompson took over, beating the victim with a chain, his fist, a chair leg, and a billy club. The testimony also indicated that it was Thompson who actually raped the victim with the chair leg and billy club. After hearing testimony that Thompson committed these atrocities, the jury heard nothing from Thompson himself in reply. As noted above, Thompson, and not Solomon, was responsible for his failure to testify. We do not believe that there is a reasonable probability that evidence of a difficult youth, an unsavory codefendant, and limited mental capacity would have altered this jury's decision.

Furthermore, the evidence offered in the district court would not be particularly persuasive even had the crime been less egregious. Barbara Savage testified at the trial as to Surace's connection with motorcycle gangs and that Thompson was following Surace's lead throughout the incident, and Solomon argued this point to the jury. With respect to Thompson's mental condition, which was not touched upon at the sentencing hearing, although the psychiat-

---

4. In the district court, Thompson also presented testimony of a psychiatrist that certain of the statutory mitigating circumstances were present. We have determined, however, that Solomon was not ineffective in failing to obtain psychiatric evidence. Accordingly, we do not consider the psychiatric testimony in determining whether Thompson has met the prejudice prong of *Strickland v. Washington.*

ric reports suggested a personality disorder, and the school records indicated low intelligence, none of the material indicated that Thompson was suffering any specific disturbance at the time of the crime which would have mitigated his participation. Finally, although Thompson's difficulties in his early years were ignored at the sentencing hearing, he has produced no witnesses, and we doubt that the jury would have found mere copies of school records particularly persuasive.

### 2. Closing Argument

■ Thompson also attacks Solomon's closing argument, set forth in the margin.[5] Thompson contends that Solomon unneces-

---

**5.** Your Honor, members of the jury: what I said to you yesterday was right. I asked you a key question, didn't I? Can you leave your minds open even if you hear horrendous evidence? Can you keep your minds open and not put in there the old Biblical term, "An eye for an eye and a tooth for a tooth," before you hear it all.

You know something here—do you know that the court-appointed lawyer, me, is the only person in this room with William Thompson? There is no mother. There is no father. There are no cousins or aunts or uncles or pastors. This man is an absolute total loser, and we might shrug our shoulders and say, "Well, after all, look what he did to this poor girl. Let's do it to him."

Is there one shred—is there some evidence to back up the law the Judge is going to read to you? Is there some evidence that you could consider that might say, "Let us give him 25 years in prison."

He'll come out 49 years of age, if he comes out at that time. If some future parole commission reads all of the evidence that you heard, seeing everything in this case and lets him out—I doubt it.

When he made the decision to ask you for mercy by pleading guilty—

MR. McHALE: I must object. That is not part of the evidence and it is not part of the law as to sentencing.

THE COURT: It is argument. Overruled.

MR. SOLOMON: Thank you.

The facts of life are that you ask a jury, when you plead guilty, to please consider mercy. Obviously, things pop into your mind. We're not children here. Mercy. How do you show this girl mercy?

There was no mercy shown this girl. Again, I come back to that question I asked you: can you take an eye for an eye and a tooth for a tooth and set it aside and accept what you hear.

Now, pecuniary gain? Well, maybe not so. What we're talking about there in that statute is robbery, the 7–11 killings—they will go in, take twelve dollars and shoot him dead. Pecuniary gain? That is not what that statute read for, but it was a heinous crime. There is no question about it, not at all.

So, the question is, then, what thread is there upon which he hangs? What did he do and what occurrences happened to, say, well, let's put him in prison for 25 years and hopefully, some parole commission, after that, when they read through all this—they will not—don't underestimate the power of a Rocco Surace. He is it. He did it. He did it with him. He followed him. Rocco Surace terrorized not just the poor girl that died, but terrorized two other people. He terrorized them. Yes, he did. He was the leader; I bet he was.

Rocco Surace says, "Take this chain. She's your old lady. Do it to her," and he picked up on the theme and he started in. God forbid, it would have been maybe not the best thing for him to say, "I'll not pick up that chain, and I'm not going to go get a board to do that," or, "I'm not going to try to emulate you, even if you take it out on my hide, Mr. Rocco Surace," and he would have—to think that this next jury that has got to sit in here and try Rocco Surace—

THE COURT: no comment.

MR. SOLOMON: All right, sir.

Did this man do something upon which you can say, may be, we'll consider something in his behalf? Yes. The evidence from the lady was that there was one thing that Rocco Surace didn't tell him to do, that he did on his own, and that was the peroxide, and that was the wiping it down. Turned mind, perverted mind that it might be over here, he got that peroxide to wipe her down and care for the wounds.

There was testimony that she went out and got some sugar and water and brought it back. That was his, not Rocco Surace's, instruction. That isn't much of a thread to hang things on, is it, that after this horrendous beating you administer—after copying and emulating the great Rocco Surace, that you went out and you got peroxide and you got some water and sugar because she was a diabetic, without his direction, on your own, without the direction of Rocco Surace.

MR. McHALE: I object. There is no such testimony in the record.

MR. SOLOMON: Yes, Judge. He sent her out there—

THE COURT: It is in the testimony.

MR. SOLOMON: I am going to review with you, just for a moment, certain worse, damaging, aggravating circumstances shall be limited to the following and that's what you heard from Mr. McHale. It says, "Limited to the following."

Although it says, "mitigating circumstances shall be the following." it doesn't say, "Limited to," So, you can consider other elements.

MR. McHALE: Objection.

sarily stressed the horror of the crime, and that he should not have referred to his court-appointed status. This court has previously condemned references to court-appointed status, arguing that such references "effectively stack the odds against the accused." *Goodwin v. Balkcom*, 684 F.2d 794, 805–06 (11th Cir.1982), *cert. denied*, 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983). In *King v. Strickland*, 714 F.2d 1481, 1491 (1983), *reinstated*, 748 F.2d 1462 (11th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985), this court granted relief on a claim of ineffective assistance of counsel based in part on a closing argument which "did more harm than good." 748 F.2d at 1464.

Counsel representing a defendant in a death case is in a difficult position, and

Solomon's failure to present any mitigating evidence made the task even more difficult. Where, as here, the defendant has pleaded guilty, counsel can hardly make a credible closing argument asking for mercy without acknowledging the crime; nor can he ignore the defendant. Thompson argues that Solomon's discussion of Thompson as a "loser" and of the heinous nature of the crime, went far beyond the need to maintain credibility. In this case, Solomon may have gone beyond what was necessary. We decline, however, to further critique the closing; reviewing courts must not unnecessarily "grade counsel's performance," *Strickland v. Washington*, 104 S.Ct. at 2070, and this admonition seems particularly compelling in the case of closing argument, an inherently subjective task. Here,

THE COURT: Sustained.

MR. SOLOMON: You will, then, have to consider these elements and weigh them. The defendant has no significant history of prior criminal activity. Now, you can let your minds figure that one out. Never before has this man ever done anything violent.

MR. McHALE: Objection. This is not evidence.

THE COURT: Sustained.

MR. SOLOMON: The State, Your Honor, has admitted that he has not been convicted of anything.

THE COURT: No, that is not their testimony, sir. That is not his statement.

MR. SOLOMON: The defendant acted under extreme duress or under the substantial domination of another person—Rocco Surace.

The capacity of the defendant to appreciate the criminality of this conduct and to conform his conduct to the requirements of the law are substantially impaired. I couldn't say that. There is no proof of that, and I say to you that any person that would do what he did has to be not in this world.

Prior to the State, three psychiatrists have ruled that he was sane.

MR. McHALE: Objection, Your Honor.

THE COURT: Sustained.

Mr. Solomon, you are confined, sir, to what has been brought out in the evidence.

MR. SOLOMON: The question arises, then, what thread can you hang it on? What can you give him? Can you give him the fact that he pled guilty to you and he seeks mercy?

You can give him the fact that after this two-hour stint, or whatever period of time passed by, it must have dawned on his head, the enormity of what he did, and he started to take care of her with the peroxide and get some water and sugar into her.

MR. McHALE: I object. There is no evidence.

THE COURT: Yes, there is. The testimony is that there was sugar set out for her.

MR. McHALE: Not that this defendant did anything.

THE COURT: Well, it was at their directions. Overruled.

MR. SOLOMON: The question that arises, shall we take the man's life, or shall we put him in prison until he's 49 years old? I think if the State desired to put everybody to death, they would say so. 25-year minimum—minimum. However you are right now, whatever age you are, add 25 years to it. He will go nowhere. He will be punished.

Now, the question is, what shall you do? Is there a thread there upon which to hang any hope for this man, or at least let him live someplace in prison, and I say there is. The fact that he came in here and asked for mercy—the fact that he came in here and that he went out and he did these things to her to relieve her and to wipe her down and to get her sugar and water, that might be very, very thin to you, but that is a spark, and if there is a spark, there is a place for hope. It may be, at some future time during this 25-year period of time, if you put him in prison, that the whole system, our state and the rest of these states, will wise up and then say, "Now, we have this man in our custody. Let us see what makes him tick."

Richard Speck—Richard Speck and six nurses, was it? Life imprisonment.

MR. McHALE: Judge, I object.

THE COURT: Sustained.

MR. SOLOMON: We feel that it is a greater punishment, much greater punishment to see that he spends his life in prison, and there is no hope of ever getting out, at least for 25 years, and we leave it in your hands. Thank you.

in light of the overwhelming evidence of aggravating circumstances, we believe that Thompson has failed to show a reasonable probability that the closing argument, even considered together with Solomon's failure to present mitigating evidence, changed the outcome. We therefore need not determine whether the argument met the standard of reasonably professional assistance. 104 S.Ct. at 2070.

In only one case, *King v. Strickland,* have we relied on counsel's closing argument to grant relief under the *Strickland v. Washington* standard. The closing argument in *King* is in one respect similar to the argument in this case; both counsel referred to their court-appointed status. In *King,* however, counsel in effect apologized to the jury for representing such a horrible person, 714 F.2d 1491, and totally disassociated himself from his client. Solomon's reference to his status was in an attempt to evoke sympathy for his client, and Solomon did not attempt to disassociate himself from Thompson. More important, King's conviction, unlike Thompson's was based on circumstantial evidence, and such convictions always present a better case for mercy to the sentencing jury. 748 F.2d at 1464.

In sum, the overwhelming evidence of aggravating circumstances convinces us that there is not a reasonable probability that the jury would have changed its sentencing conclusion had Solomon presented and argued the mitigating evidence now offered, and Thompson's claim of ineffective assistance at his sentencing hearing therefore must fail under the prejudice prong of *Strickland v. Washington.*

## II. RESTRICTION ON MITIGATING EVIDENCE

### A. *Nonstatutory Evidence*

Thompson contends that the trial court restricted consideration of non-statutory mitigating factors in violation of *Lockett v. Ohio,* 438 U.S. 586, 606–08, 98 S.Ct. 2954, 2965–67, 57 L.Ed.2d 973 (1978). He argues that the jury instructions, coupled with objections the judge sustained when Solomon attempted to advise the jury that they were not limited to statutory mitigating circumstances and when he sought to elicit testimony that Thompson was taking drugs at the time of the crime, all indicate that evidence of non-statutory mitigating circumstances was restricted.

The district court found that Thompson had presented this claim to the Florida courts on direct appeal and therefore considered it on the merits and denied relief. Based on the briefs and opinions in Thompson's state appeal, the state contends that the issue was not presented on Thompson's direct appeal and asks that we apply procedural default to the claim. *See Ford v. Strickland,* 696 F.2d 804, 816–17 (11th Cir. 1983) (en banc) (Florida rule that all grounds must be raised on direct appeal adequate reason to bar federal review). The state argues that although it has waived exhaustion of the claim, it has not and does not waive procedural default. This argument raises difficult questions. First, we note that the *Lockett* claim was one of the original claims in Thompson's petition, filed on February 24, 1982. Not until July 9, 1984, the day of the evidentiary hearing, did the state first assert that the claim had not been presented to the state courts. Moreover, at no time did the state file a motion to dismiss the claim. In the meantime, the district court had held a hearing on whether to continue its consideration of the petition, this court had entertained an interlocutory appeal, the state had offered an unconditional waiver of exhaustion, and the district court had exercised its discretion to accept that waiver. Throughout this time (February 24, 1982— July 9, 1984), the parties acted under the assumption that the claims in the original petition had been presented to the Florida courts. *See, e.g., Jenkins v. Andersen,* 447 U.S. 231, 100 S.Ct. 2124, 2127 n. 1, 65 L.Ed.2d 86 (state may waive procedural default by not asserting it in a timely manner). Second, the state's offer of a waiver of exhaustion was unconditional. Now the state requests that the federal courts apply procedural default, a state law ground of

decision, to a claim in the petition. The district court's acceptance of the waiver was discretionary, and had the court been told that the state wished the court to apply a state law ground of decision, the district court may well have chosen to decline the state's waiver. *See Thompson v. Wainwright,* 714 F.2d 1495, 1508–09 (district court should decline waiver of exhaustion if undecided questions of state law exist). Accordingly, it seems quite possible that the state has waived procedural default. We need not decide this question, however, because the district court was clearly correct in declining Thompson relief on the merits of his *Lockett* claim.

■ This court recently has described the method for analyzing *Lockett* claims such as the one advanced by Thompson. *Hitchcock v. Wainwright,* 770 F.2d 1514 (11th Cir.1985) (en banc). A court should consider all the circumstances, including the status of Florida law at the time of sentencing, the trial record, and proffers of nonstatutory mitigating evidence claimed to be available. 770 F.2d at 1517. Here, at the time of sentencing, the confusion in Florida law had partially been alleviated by *Lockett,* but the Florida Supreme Court had not yet issued its clarifying opinion in *Songer v. State,* 365 So.2d 696, 699 (Fla. 1978).[6] Solomon, however, did not proffer any nonstatutory mitigating evidence at the sentencing hearing. Solomon also testified in the district court that in preparing for the sentencing hearing he did not feel constrained by Florida law in investigating nonstatutory mitigating circumstances.

Solomon did testify that he felt constrained when the trial court sustained objections to questions about alcohol and drug use by Thompson and Surace, and the record of the sentencing proceeding indicates that the court did limit cross-examination on this point. For example, Savage was not allowed to answer Solomon's question whether they were taking any pills. Thompson, however, did not proffer, either

at trial or in the district court hearing, what the witness would have answered. Furthermore, in her pretrial deposition Savage did not state that Thompson was taking drugs, although she did indicate that Thompson and Surace were drinking heavily on the day of the crime, and this fact came out in other testimony. We conclude therefore that Thompson has not shown any excluded evidence that could have affected the sentence. The testimony introduced at the sentencing hearing indicated that at the time of the crime Thompson was well able to communicate, and that he and Surace concocted an alibi story. Accordingly, we find that additional evidence regarding intoxication would have been cumulative and would not have made a difference to the sentencing jury.

In sum, with respect to nonstatutory mitigating circumstances, we conclude that Thompson did not proffer any significant nonstatutory mitigating circumstances either at sentencing or at the district court's evidentiary hearing and that his claim must therefore be denied.

B. *Statutory Mitigating Evidence*

■ Thompson also contends that the trial court excluded evidence of statutory mitigating circumstances; specifically he argues that the court limited cross-examination intended to show that he was under the influence of an extreme emotional disturbance. Fla.Stat.Ann. § 921.141(6)(b). The only testimony Thompson claims was excluded, however, was Savage's response to questions concerning whether Thompson intended the beating to kill the victim. The trial judge did not rule that the testimony was irrelevant; rather he ruled that the witness could not testify to the subjective intentions of another person, and Thompson does not argue that this ruling was improper under the Florida rules of evidence. *Lockett* entitles a capital defendant to introduce all relevant mitigating evidence at sentencing, but does not require a

---

**6.** Thompson's sentencing hearing occurred on September 19–20, 1978. The Supreme Court decided *Lockett* on July 3, 1978. The Florida Supreme Court issued its opinion on rehearing in *Songer* on December 21, 1978.

state to abandon its rules of evidence concerning what is competent testimony. *Cf. Martin v. Wainwright,* 770 F.2d 918, 938 (11th Cir.1985) (*Lockett* does not abrogate Florida evidentiary rule which prevented defendant from admitting selected portions of documents without admitting entire document).

## III. WHETHER THE COURT SHOULD HAVE FURTHER INQUIRED INTO THOMPSON'S COMPETENCY TO STAND TRIAL

 Thompson contends that the trial court should have conducted a hearing into his competency to stand trial. A court that has a bona fide doubt of the defendant's competency to stand trial must *sua sponte* conduct a hearing to consider that issue. *Pate v. Robinson,* 383 U.S. 375, 385, 387, 86 S.Ct. 836, 842, 843, 15 L.Ed.2d 815 (1966); *Hance v. Zant,* 696 F.2d 940, 948 (11th Cir.), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983). The test for competency to stand trial is: whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). The district court found that no doubt had been raised of Thompson's competency.

 Three factors should be considered in determining whether the trial court violated *Pate* by not conducting a hearing on competency: (1) evidence of the defendant's irrational behavior; (2) his demeanor at trial; and (3) any prior medical opinion on his competency to stand trial. *Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975). Before the first plea proceeding in 1976, Thompson was examined by four psychiatrists, and all four found him competent to stand trial. Thompson filed a new motion for examinations in connection with the 1978 plea proceeding, but as the Supreme Court of Florida noted, nothing in the motion indicated

any "circumstance that had caused the mental condition of the appellant to change since those prior examinations." 389 So.2d at 199.

Thompson contends that his responses during the trial judge's interrogation at the plea proceeding raised a doubt as to his competency. The trial judge interrogated Thompson regarding any past mental problems, and whether he understood the proceedings and the ramifications of pleading guilty. Thompson points to one response as raising a doubt: when the court asked Thompson if he had been employed in the past two years, Thompson answered yes; in fact, Thompson had spent the prior two years in either the county jail or on death row. This one incorrect response, however, hardly indicates that Thompson was incompetent. Thompson correctly answered numerous questions from the judge, and we conclude that there was no need for the judge to further inquire into Thompson's competency.

## IV. AKE CLAIM

 Before the sentencing proceeding, Solomon requested that the court appoint experts to conduct psychiatric and neurological examinations of Thompson. The trial court denied these requests and the Florida Supreme Court affirmed. 389 So.2d at 199. In his habeas petition, Thompson contends that the denial of psychiatric assistance unconstitutionally restricted the presentation of mitigating circumstances. Subsequent to the district court's ruling on the petition, the Supreme Court decided *Ake v. Oklahoma,* — U.S. —, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), in which it established a limited right to court-appointed psychiatric assistance in presenting a defense. We now evaluate Thompson's claim in light of *Ake.*

In *Ake,* the Supreme Court considered an indigent defendant's need for psychiatric assistance both at trial and at the death penalty sentencing hearing. With respect to guilt or innocence, the Court held

that when a defendant demonstrates to the trial judge that his sanity at the time

of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Id.,* 105 S.Ct. at 1097.

Thompson's claim on appeal, however, is limited to the sentencing phase and the Court's discussion in *Ake* of the need for psychiatric assistance in capital sentencing proceedings was somewhat different. The Court focused on the fact that certain states place before the jury psychiatric evidence of a defendant's future dangerousness, and that the Court had approved such a practice. *Id.* at 1097 (quoting *Barefoot v. Estelle,* 463 U.S. 880, 896–905, 103 S.Ct. 3383, 3395–3400, 77 L.Ed.2d 1090 (1983)). The Court held:

> In such a circumstance, where the consequence of error is so great, the relevance of responsive psychiatric testimony so evident, and the burden on the State so slim, due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing hearing.

*Id.,* 105 S.Ct. at 1097.

The motion filed with the trial court stated that counsel believed Thompson suffered from a mental defect "which would render him incapable of assisting in his defense, and may have precluded the Defendant from knowing right from wrong at the time of the alleged criminal acts." The trial court heard the motion, and again no mention was made of mitigating circumstances. Because Thompson did not request psychiatric assistance to aid in presenting mitigating circumstances, *Ake* does not apply. *Bowden v. Kemp,* 767 F.2d 761, 764; *Bowden v. Francis,* — U.S. —, 105 S.Ct. 1834, 1834–35, 85 L.Ed.2d 135 (1985) (O'Connor, J., dissenting from remand to court of appeals in light of *Ake* ).[7] We hold therefore that *Ake* did not require appointment of a psychiatrist at the sentencing phase.

Thompson did argue in his motion for a new trial and his brief on direct appeal to the Florida Supreme Court that the denial of psychiatric assistance limited the development of mitigating circumstances. *Ake,* however, requires appointment of psychiatric assistance only where a showing of need is made before trial. 105 S.Ct. at 1097.[8]

## V. COERCION OF THOMPSON'S PLEA

Finally Thompson contends that his decision to plead guilty, and to testify on behalf of Surace was not voluntary, but was coerced by threats from Surace. Thompson presented this claim to the Florida courts in a motion for collateral relief. The state trial court found Thompson's affidavit not credible, and refused to hold a hearing. The Florida Supreme Court affirmed. 410 So.2d 500 (1982).

At the district court hearing, Thompson testified that he was coerced into pleading guilty and testifying for Surace. He explained that while he and Surace were being held together in 1978, Surace told Thompson to take credit for the killing or Surace would have him killed, and Thompson testified that he believed Surace could do this based on Surace's membership in motorcycle gangs and Surace's comrades in prison. Thompson introduced no evidence to corroborate this testimony, other than a stipulation by the state that at the time of Thompson's second plea, Thompson and Surace were transported to the county court-

---

**7.** We do not consider whether Thompson would have a valid *Ake* claim had he made a proper request.

**8.** Solomon's failure to request psychiatric assistance with respect to mitigating circumstances was not ineffective assistance of counsel. The Supreme Court's decision in *Ake* was a change in the law which was not foreseeable in September 1978, and defendants are not entitled to an attorney capable of foreseeing the future development of constitutional law. *Proffitt v. Wainwright,* 685 F.2d 1227, 1249 & n. 34 (11th Cir. 1982), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983).

house together and held in the same cell while in the courthouse, and testimony of Thompson's trial lawyers that Surace used Thompson as his "tool" and before the second plea proceeding Surace's counsel was attempting to convince Thompson to commit perjury. Surace testified in the district court and denied Thompson's allegations. After hearing the testimony, the district court found that Thompson had not met his burden of proof, in effect finding that Thompson's testimony was not credible.

Although Thompson challenges the voluntariness of his plea as a ground on appeal, he provides no legal arguments in his brief. As stated above, based upon Thompson's affidavit attached to his pleadings in the collateral proceeding, the state courts found his claim incredible and held no hearing. The district court received evidence on the claim at the evidentiary hearing, but in its order denying relief ruled that Thompson had not met his burden under section 2254 of proving that the conclusion of the state court on collateral review was erroneous.[9] The effect of the section 2254 presumption was that Thompson was required to present convincing evidence that his plea was not voluntary; normally, a habeas petitioner need only demonstrate by a preponderance of the evidence that he is entitled to relief. 28 U.S.C. § 2254(c); *Thomas v. Zant,* 697 F.2d 977, 986 (11th Cir.1983). The district court's understanding of section 2254 was mistaken. Section 2254(d) does provide that a federal court considering a habeas petition must afford a presumption of correctness to state court factual findings, but only if the findings were made "after a hearing on the merits of a factual issue," and that hearing must meet the requirements set forth in section 2254(d)(1)–(8). Here the state court refused to hold such a hearing, and thus the findings of the state courts in

the *collateral proceeding* are not entitled to a presumption of correctness.

Nevertheless, we do not believe that a remand is necessary. Although the state courts did not hold a hearing on collateral review, the state trial court held an adequate hearing on Thompson's plea at the time it was entered. The transcript of that proceeding is part of the record. The trial court placed Thompson under oath, and specifically inquired:

THE COURT: Has any persons [sic] used any threat, force, pressure, intimidation, or promised anything to you for the purpose of getting you to plead guilty to these charges?

THE DEFENDANT: No, Sir.

THE COURT: Are you doing it voluntarily?

THE DEFENDANT: Voluntarily, sir.

The state trial court then announced that it found that Thompson's "decision to plead guilty has been made freely, voluntarily, and intelligently."

In *Blackledge v. Allison,* 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977), the Supreme Court stated that "the representations of the defendant [at a plea hearing] as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." 97 S.Ct. at 1629. The Court further ruled that the petitioner's "declarations in open court carry a strong presumption of verity." *Id.* In *Moya v. Estelle,* 696 F.2d 329 (5th Cir.1983), the habeas petitioner contended that his own attorney had intimidated him into pleading guilty. The new Fifth Circuit held that in light of the petitioner's sworn statement at the plea proceeding that he had not been threatened and that he was satisfied with counsel, no evidentiary hearing was necessary on his claim in a federal habeas proceeding. 696

9. The district court stated that:

This court has reviewed the testimony before this Court by petitioner, and petitioner's trial counsel. The question of whether petitioner was indeed coerced—or felt coerced is extremely troublesome. The State courts have

considered and rejected the claim of coercion, however, and under 28 U.S.C. § 2254(d), the burden is on petitioner to convince this court that the finding of the State courts was erroneous. Petitioner has failed to meet this heavy burden.

F.2d at 332–33. *See also, Rogers v. Maggio,* 714 F.2d 35, 38 n. 5 (5th Cir.1983).

Here, Thompson testified under oath that his plea was not coerced, and the state trial court so concluded. The district court in effect gave these findings a presumption of correctness. We see little difference between the presumption of correctness under section 2254 and the "strong presumption of verity" identified by the Supreme Court in *Blackledge.* Accordingly, the district court was correct in requiring Thompson to present convincing evidence that his plea was not voluntary and the district court's conclusion that Thompson failed to meet this burden is not clearly erroneous.

## CONCLUSION

For the foregoing reasons, the order of the district court denying Thompson's petition for a writ of habeas corpus is

AFFIRMED.