[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 17, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-12553
_____

D. C. Docket No. 96-N-1016-M


THOMAS J. FORTENBERRY,

Petitioner-Appellant,

versus

MICHAEL W. HALEY, Commissioner,
Alabama Department of Corrections,

Respondent-Appellee.


_____

Appeal from the United States District Court
for the Northern District of Alabama
_____
(July 17, 2002)


Before ANDERSON, BIRCH and BARKETT, Circuit Judges.

PER CURIAM:

Thomas Fortenberry, an Alabama prisoner under sentence of death, appeals the denial of his petition for a writ of habeas corpus. The district court rejected eighteen constitutional claims, seven of them on the merits and the remaining eleven because of procedural default. The district court granted a Certificate of Appealability ("COA") with respect to all issues, three of which Fortenberry raises here. Fortenberry argues (1) that the prosecution used its peremptory challenges to

discriminate unconstitutionally on the basis of race; (2) that the trial court's "heinous, atrocious and cruel" instruction to the jury was unconstitutional; and (3) that defense counsel rendered ineffective assistance at the guilt and penalty phases of Fortenberry's trial. For the reasons set forth below, we AFFIRM.

## I. BACKGROUND

On August 25, 1984, four people were shot and killed at the Guest Service Station in Attalla, Alabama. The victims were Ronald Guest, Wilbur T. Nelson, Bobby Payne, and Nancy Payne. In late March 1985, a local resident found a pistol on the bank of Black Creek, in nearby Alabama City. Ballistic evidence showed that the pistol had been used to commit the Guest murders. Because the pistol was found without grips, it was impossible to lift any fingerprints from it; however, the police were able to trace it to a gun repair business that was partly owned by Fortenberry's father and a man named Jerry Gable. In addition, the sheriff's office obtained statements from three people who had seen the pistol in Fortenberry's possession shortly before the Guest murders. Based on this evidence, officers went to Fortenberry's home on May 2, 1985, and brought him to the courthouse for questioning. They arrived at the courthouse at about 6:45 p.m. Fortenberry signed a waiver of rights form. Officers questioned Fortenberry about the pistol used in the four murders at the Guest Service Station, and Fortenberry admitted taking it from his father and Gable. At around midnight, Fortenberry showed the investigators where he said he had disposed of the pistol, which was the same spot where it had been found. Then, over the next two days, Fortenberry

2

provided several inconsistent accounts of what had happened at the Guest Service station. We describe these statements in some detail here because they were central to the prosecution's case against Fortenberry, and because he now claims that he is innocent of the murders.

On May 3, at about 12:50 a.m., Fortenberry made a taped statement in which he explained that, on the day of the murders, he was riding in his brother's green Chevrolet truck with the stolen pistol, when he came upon a man named Harvey Underwood and "this other guy" in the woods. Fortenberry stated that the "other guy" was "passed out," and that Underwood was drinking beer and smoking marijuana. Fortenberry stated that he and Underwood decided to ride together to Albertville, but that they stopped at the Guest Service Station on the way because they had run out of beer. Fortenberry stated that, while they were at the station, he sat in the truck while Underwood robbed the station and committed the murders. Fortenberry said that he returned Underwood to the place where he had met him and that Underwood kept the gun until Fortenberry got it from him a few days later and threw it into Black Creek. He said he never told the police because he was frightened of Underwood.

On the same day at 5:25 p.m., Fortenberry made a written statement in which he contravened his taped statement. This time Fortenberry explained that he had gone to the Guest Service Station on the evening of the murders, intending to steal money for gambling. After he took some money from Nelson, he went outside, and Guest and Bobby Payne walked in front of him. Fortenberry stated

3

that he shot the two men, and went back in the station and shot Nelson.  Then he came back outside and saw Nancy Payne running up the hill, and shot her.  Fortenberry explained that he left with $240 of stolen money, threw the gun away, and went to a pool hall to provide himself an alibi.  He also declared that his earlier statement blaming the murders on Harvey Underwood was false.

On the following day, May 4, Fortenberry gave a sworn statement before a court reporter in which he provided a third, more detailed account.  Fortenberry now explained that on the day of the murders he had gone looking for a place to rob for gambling money, when he came upon the Guest Service Station.  He pulled up in front of the station in his brother's green and white Chevrolet truck, went in, pulled his gun on Nelson and demanded money.  He also held his gun on Bobby Payne, who had just driven up to the station and come inside during the course of the robbery.  Another car pulled up, Fortenberry said, and Guest opened the station door to enter.  Fortenberry hid his gun from Guest, but Guest turned away and left after Nelson whispered something to him.  Fortenberry then got money from Nelson and was leaving when Bobby Payne followed him out of the store.  Guest then came up beside him and said "Tommy, put down the gun."  Fortenberry said that he panicked and ordered Bobby Payne to give him money, whereupon Payne said Fortenberry would have to kill him to get his money.  Fortenberry then shot Bobby Payne and Guest, and went back inside the station and shot Nelson.  Then, Fortenberry explained, he went back out to his truck, saw a woman running, and shot her.  Fortenberry stated that he got into his truck and drove northbound for a

4

while until he came to a turnaround and then headed back toward Attalla. Fortenberry said that he took $240 from Nelson, but nothing from anyone else. He drove out to an area near the Black Creek, threw the gun into the woods, and went to a pool hall in order to establish an alibi. Fortenberry repeated that his earlier story that Underwood had committed the murders was false.

Fortenberry was indicted under the Alabama Death Penalty Act for two counts of "[m]urder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct," Ala. Code § 13A-5-40 (a)(10) (1975), and "[m]urder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant," Ala. Code § 13A-5-40(a)(2)(1975). The court appointed Stephen Harrison to represent Fortenberry at trial, and Walden Buttram to assist him. Neither Harrison nor Buttram had previously tried a capital case. Fortenberry pleaded "not guilty," and the case went to trial.[1]

At trial, Fortenberry testified that he had not committed the murders. Fortenberry said that he was driving through the woods one evening and came upon "the fire place where everybody partied at." He stated that he had the pistol under his car. He saw Underwood drinking beer and another man who was "passed out." Fortenberry stated that he noticed that a truck was parked there, but he did not know if it was Underwood's. Fortenberry testified that he had tried to

---

[1]While awaiting trial, Fortenberry escaped from jail. On January 1, 1986, having been recaptured, Fortenberry gave a statement to police investigators in which he again admitted having committed the Guest Station murders.

5

sell the gun to Underwood.  Underwood said he could not afford it, but that he knew some "boys" in Albertville who might want to buy it.  Underwood then proposed that he and Fortenberry go to Albertville together in Fortenberry's car to meet the potential buyers.  Fortenberry testified that he declined to drive, protesting that he did not have a spare tire, so Underwood then suggested that they take the truck parked nearby.

Fortenberry testified that he and Underwood were on their way to see the potential gun buyers when they stopped for beer at the Guest Service Station.  Fortenberry went in and purchased some beer, and then walked out as Underwood started going through the store's cooler.  Fortenberry was in the truck when Guest pulled up and started to go into the store.  Nelson stopped Guest at the door, however, and Guest returned to his car.  Fortenberry testified that he then got out of the truck and walked back into the service station, where he saw Underwood threatening Nelson with a knife.  Underwood instructed him to get back in the truck, which he did, and Guest then backed his car and reentered the service station.  At this point Bobby and Nancy Payne arrived, and Bobby Payne went into the service station.  At some point, Fortenberry said, Underwood returned to the truck and exchanged his knife for the murder weapon.

Fortenberry testified that the three men were in the station for a minute, after which Guest walked back out to his car and bent over inside of it.  Fortenberry said a woman then got out of Guest's car and "ran up the back of the store," and Guest started walking back to the station.  Fortenberry then heard a shot, and saw

6

Underwood exiting the store, followed by Bobby Payne, who was shouting at him. Payne walked in front of Underwood, and Guest came up on the other side of him. Fortenberry testified that Bobby Payne then started calling Underwood names and cursing him. Underwood asked Payne to shut up and said he was leaving. When Bobby Payne then told Underwood that he would have to wait for the police, Underwood shot him and Mike Guest. Then, when Nancy Payne ran toward the woods, Underwood shot her. Fortenberry testified that they then returned to the woods where Fortenberry's car was parked. Underwood instructed him to throw the gun in Black Creek, which Fortenberry did. Fortenberry testified that Underwood warned him not to tell anyone about the murders.

The State's case at trial relied heavily on Fortenberry's prior confessions, and the prosecution argued to the jury that Fortenberry's in-court explanation was riddled with inconsistencies. In addition, the prosecution established Fortenberry's access to the gun used in the murders, and a defense witness testified that Fortenberry had tried to sell it to him. Prosecution witness Tracy Henry Wood testified that she and her boyfriend at the time, Mike Guest, had arrived at the station shortly before the murders occurred, and that Guest had gone inside to get a coke while she waited outside. Wood testified that she had seen a blue and white pickup truck with some people inside. She also testified that after Guest went into the station, a tall, tanned man with a large stomach came out of the station holding two beers. She testified that Guest then came out, and told her to get his father Alvis, who lived in the house behind the station, and to tell Alvis to bring a gun,

7

because "there was going to be trouble." Wood testified that when she got to the Guest home she heard two shots, and then two more on her way back to the station. When she arrived, she found the four victims. At trial Wood was shown a photograph of Underwood, but she could not recall if she had ever seen him before.

Wood never identified Fortenberry as having been at the station, but the prosecution argued that her account of events was more consistent with Fortenberry's confessions than his trial testimony. In response, defense counsel pointed to the fact that in both her statement to the police and her testimony at trial, Wood had described the man with the large stomach, who did not fit Fortenberry's description. Defense counsel argued to the jury that this man actually committed the crime, consistent with Fortenberry's testimony regarding Underwood.[2] The defense also presented testimony from several of Fortenberry's family members, who testified that Fortenberry was not experienced at firing pistols. Jerry Gable, however, testified that Fortenberry was skilled enough to have committed the four murders with the pistol.

The jury returned a verdict at 6:00 p.m. on Saturday, February 15, 1986, convicting Fortenberry on both counts of the indictment. The trial court then polled the jury about whether it was prepared to move immediately to the penalty phase. When the jury indicated that it wished to proceed, defense counsel moved for a continuance before beginning the penalty phase, arguing that defense counsel

---

[2]The prosecution argued that this person was probably Bobby Payne.

8

was unprepared and would "be much better able to present [its] position for mitigation" if a continuance were granted until the following Monday. The court denied this motion and immediately began the penalty phase of trial.

During the penalty phase, which lasted approximately forty-five minutes, the prosecution argued for the death penalty based on two aggravating factors: first, that the capital offense was committed in the course of robbery or attempted robbery; and second, that the offense was especially heinous, atrocious or cruel ("HAC"). Adopting the evidence presented during the guilt phase, the prosecution argued that the jury should find the robbery factor because it had already convicted Fortenberry of murder in the course of a robbery, and the HAC factor because Fortenberry had committed a multiple "execution style slaying."

To make out a mitigation case, Fortenberry's counsel called Fortenberry's father to testify as the only witness. Fortenberry's father gave fourteen lines of testimony, in which he stated that his son was a twenty-two-year-old graduate of nursing school, with no adult criminal record. After the close of its mitigation case, defense counsel again moved for a continuance, "on the grounds stated earlier, on the basis that we have not had sufficient time to prepare any evidence or argument for this phase of the trial." The court denied the motion. After receiving instructions and deliberating, the jury returned a verdict recommending that Fortenberry receive the death penalty.

Two weeks later, at the separate sentencing hearing before the trial judge, the court refused defense counsel's request for a postponement of sentencing or a

9

new sentencing hearing before a jury. The judge then sentenced Fortenberry to death. The Alabama appeals courts affirmed the conviction and sentence, and the United States Supreme Court denied Fortenberry's petition for writ of certiorari. Fortenberry v. State, 545 So. 2d 129, 145 (Ala. Crim. App. 1988); Ex parte Fortenberry, 545 So. 2d 145 (Ala. 1989); Fortenberry v. Alabama, 495 U.S. 911 (1990).

Fortenberry filed a petition for post-conviction relief pursuant to Ala. R. Crim. P. Temp. 20, represented by the law firm that currently represents him in this appeal.[3] In that petition, Fortenberry raised forty-five issues. The Rule 20 court denied Fortenberry's petition following an evidentiary hearing. The Alabama Court of Criminal Appeals affirmed the denial of post-conviction relief. Fortenberry and the State of Alabama filed applications for rehearing in that court, in response to which the Alabama Court of Criminal Appeals withdrew the original opinion and substituted a new opinion affirming the denial of the Rule 20 petition. Fortenberry v. State, 659 So. 2d 194 (Ala. Crim. App. 1994). The Alabama Supreme Court then denied Fortenberry's petition for writ of certiorari to the Alabama Court of Criminal Appeals. The United States Supreme Court denied Fortenberry's petition for writ of certiorari on the collateral claims. Fortenberry v. Alabama, 516 U.S. 846 (1995). Fortenberry then filed a petition for writ of habeas corpus in the federal district court, along with a second Motion Requesting an Evidentiary Hearing and a Motion to Expand the Record. The district court denied

---

[3]This rule has subsequently been replaced by the permanent Ala. R. Crim. P. 32. For convenience, we refer to these proceedings throughout as "Rule 20."

the writ and motions.

Fortenberry now appeals, asserting that he is entitled to relief on three grounds. First, Fortenberry argues that the district court concluded wrongly that he was procedurally barred from presenting his claim that he was deprived of a fair trial by the prosecutor's use of racially discriminatory peremptory challenges. Second, Fortenberry asserts that the district court wrongly determined that he was procedurally barred from presenting his claim that the jury instruction regarding one of the aggravating factors—that the crime was heinous, atrocious and cruel—was unconstitutionally vague and violated due process and the prohibition against cruel and unusual punishment. Third, Fortenberry argues that trial counsel rendered ineffective assistance during the guilt phase, by failing adequately to investigate and present exculpatory evidence, and during the sentencing phase, by failing adequately to investigate or present mitigating evidence. We consider these grounds sequentially below.

## II. STANDARD OF REVIEW

We review de novo a district court's denial of a habeas corpus petition. Sims v. Singletary, 155 F.3d 1297, 1304 (11th Cir. 1998). A district court's dismissal of a habeas claim for procedural default is likewise reviewed de novo. Baily v. Nagle, 172 F.3d 1299, 1302 (11th Cir. 1999). An ineffective assistance of counsel claim presents mixed questions of law and fact, which we review de novo. Dobbs v. Turpin, 142 F.3d 1383, 1386 (11th Cir. 1998). Because Fortenberry filed his petition prior to April 24, 1996 it is not governed by the Anti-terrorism and

11

Effective Death Penalty Act ("AEDPA"). Rather, both the district court and this court must apply pre-AEDPA law. Under the pre-AEDPA standard applicable to factual determinations, we are bound by the state court's findings of fact unless they are not "fairly supported by the record." 28 U.S.C. § 2254(d)(8). We will not disturb the district court's findings of fact unless they are clearly erroneous. Williams v. Turpin, 87 F.3d 1204, 1209 (11th Cir. 1996).

### III. DISCUSSION

1.      Peremptory Challenges

Fortenberry first contends that the district court wrongly concluded that a procedural bar precluded his claim that he was deprived of a fair trial by the prosecutor's use of racially discriminatory peremptory challenges. See Batson v. Kentucky, 476 U.S. 79 (1986). Fortenberry is white, and contends that the prosecutor in his case unconstitutionally used peremptory strikes to eliminate African-Americans from the jury. In order to make this claim, Fortenberry relies on Powers v. Ohio, 499 U.S. 400 (1991), in which the Supreme Court extended Batson to such a case.

The district court determined that Fortenberry's Batson claim was procedurally barred under Alabama law because Fortenberry had not raised it at trial or on direct appeal. Fortenberry argues that in fact the Court of Criminal Appeals reached the merits of the Batson claim, thus obviating the procedural bar, and in the alternative that, even if the state court did find his Batson claim procedurally barred, he falls within each of three exceptions to procedural default.

12

First, he argues, Alabama courts have not consistently applied procedural default to

Batson claims. Second, Fortenberry contends that he can show "cause and

prejudice" for the failure to raise the Batson claim on direct appeal. Third,

Fortenberry avers that a "fundamental miscarriage of justice" would result from

applying procedural default in this instance.

As we explained in Cochran v. Herring, 43 F.3d 1404, 1408 (11th Cir.

1995):

> A federal court may not reach a federal question on collateral review of a
> state conviction if the state court's opinion "contains a 'plain statement' that
> [its] decision rests upon adequate and independent state grounds." A state
> procedural bar constitutes an adequate and independent state ground, thereby
> precluding federal habeas review, only if the last state court rendering a
> judgment in the case clearly and expressly states that it rests its judgment on
> the procedural default.

(Internal citations omitted). In this case, the Alabama Court of Criminal Appeals,

citing Alabama rules of criminal procedure, stated: "The following issues are

procedurally barred from this court's review . . . The appellant's claim that he was

denied a fair trial based on the state's use of its peremptory strikes." Fortenberry v.

State, 659 So. 2d 194, 196–97 (Ala. Crim. App. 1994). Fortenberry, however,

argues that a later passage in that opinion discussed the merits of the Batson claim,

and that therefore "the consideration of comity and federalism which would

ordinarily preclude federal review of procedurally defaulted issues no longer

apply." Horsley v. Alabama, 45 F.3d 1486, 1489–90 (11th Cir. 1995); see also

Cooper v. Wainwright, 807 F.2d 881, 886 (11th Cir. 1986) (explaining that by

deciding a constitutional question when it does not have to, a state court

13

"necessarily holds that the policies underpinning its procedural rule are unworthy of vindication under the particular circumstances of the case before it"). Fortenberry points to the following passage in the Alabama Court of Criminal Appeals opinion:

> The appellant further argues that he was deprived of a fair trial because, he argues, the prosecutor used his peremptory strikes in a racially discriminatory manner violating the United States Supreme Court's holding in Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and that his appellate counsel's performance was ineffective because counsel failed to raise this issue. The appellant is a white male. The appellant's direct appeal was final in 1990. Batson was extended by the United States Supreme Court to whites in Powers v. Ohio, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). "Powers . . . cannot be applied retroactively on collateral review of convictions that were final before Powers was decided." Parker v. State, 599 So. 2d 76, ___ (Ala. Cr. App. 1992). Therefore, Powers, which was decided in 1991, was not applicable to the appellant's case. Appellate counsel's performance was not ineffective for failing to raise this issue on appeal.
>
> Furthermore, there is absolutely no indication in the record that any violation of Batson occurred. The appellant's only grounds for support of this assertion is that some blacks were struck from the venire. As stated previously, the petitioner in a post-conviction proceeding bears the burden of pleading and proving his allegations by a "preponderance of the evidence." Rule 32.3 Ala.R.Crim.P. The appellant failed to allege in his petition who was struck from the venire or any other information concerning the composition of the venire or the composition of the jury. The appellant has failed to meet his burden.

Fortenberry v. State, 659 So. 2d at 200.

As Fortenberry observes, this passage appears to be a merits determination on Fortenberry's procedurally barred Batson claim.[4] But even if the state court in

---

[4]In fact, the above-quoted opinion, issued on September 9, 1994, supplanted the Court of Criminal Appeals' original July 29, 1994 opinion. In the original opinion, the court held on the merits that there had been no Batson violation in Fortenberry's trial. The State then applied for

14

fact reached the merits of the issue, or if Fortenberry were otherwise able to overcome the procedural bar under any of the three exceptions he invokes, the outcome would be the same. This Court has held that Powers created a new rule that cannot be applied retroactively on collateral review to cases that became final before Powers was decided. See Farrell v. Davis, 3 F.3d 370, 372 (11th Cir. 1993); Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997).[5] Because Fortenberry's appeal became final in 1989, two years before the Supreme Court decided Powers, and because "Batson clearly limited its application to defendants of the same race as the excluded jurors," Farrell, 3 F.3d at 372, Fortenberry's Batson claim would necessarily fail even if it were to fall within one of the exceptions to procedural default.

    2.    Jury Instructions at the Penalty Phase

Fortenberry argues next that the jury instruction regarding whether the capital offense was "especially heinous, atrocious or cruel" was unconstitutionally vague and violated due process and the prohibition against cruel and unusual punishment.[6] The district court concluded, as had the Alabama Court of Criminal

---

rehearing, and urged the court to hold that the Batson claim was procedurally barred. In response, the court reissued its opinion on September 9, 1994. Nonetheless, the ambiguity remains.

    [5]Fortenberry mistakenly cites United States v. Rodriguez, 935 F.2d 194 (11th Cir. 1991), for the proposition that Powers is retroactively applicable. Rodriguez, however, was pending on direct appeal when Powers was decided, so Teague was not applicable. Rodriguez is therefore inapposite.

    [6]The trial court instructed the jury that it should consider whether two aggravating circumstances had been proven beyond a reasonable doubt: first, whether "the capital offense was committed while the defendant was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery"; and

15

Appeals, that this claim was procedurally defaulted under state law because Fortenberry could have but failed to raise it at trial or on direct appeal. In addition, the district court held that Fortenberry could not overcome the procedural default under either of the two recognized exceptions to the rule. First, a petitioner may obtain federal review of a procedurally defaulted claim if he can show both cause for the default and actual prejudice resulting from the default. See Murray v. Carrier, 477 U.S. 478, 488 (1986); Wainwright v. Sykes, 433 U.S. 72 (1977); Smith v. Newsome, 876 F.2d 1461, 1465 (11th Cir. 1989). A petitioner can establish cause by showing that a procedural default was caused by constitutionally ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 690 (1984). See Carrier, 477 U.S. at 488. Second, a federal court may also grant a habeas petition on a procedurally defaulted claim, without a showing of cause or prejudice, to correct a fundamental miscarriage of justice. See Carrier, 477 U.S. at 495–96 (explaining that a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent"). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. Schlup v. Delo, 513 U.S. 298, 327 (1995). In addition, "'to be credible,' a claim of actual innocence must be based on reliable

second, whether "the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses." The court explained that "[t]he term heinous means extremely wicked or shockingly evil; the term atrocious means outrageously wicked and vile; the term cruel means designed to inflict a high degree of pain with utter indifference to, or enjoyment of, the suffering of others."

16

evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324).

Fortenberry argues that the district court erred because he satisfies both of these exceptions. We disagree. Fortenberry has not presented persuasive evidence of his actual innocence, and thus we reject his fundamental miscarriage of justice claim. Fortenberry argues that he can establish cause because, he says, his counsel rendered ineffective assistance by failing to raise the HAC issue at trial and on appeal. Fortenberry argues that he can demonstrate prejudice because he is likely to have succeeded on the claim. Neither argument is persuasive because it is clear that the HAC claim is ultimately without merit.

Under Alabama's current death-penalty statute, following a jury verdict in the guilt phase, the trial court conducts a sentencing phase in which the jury is presented with evidence of aggravating and mitigating factors. See Ala. Code 1975 § 13A-5-46. Having considered this evidence, the jury then issues an "advisory verdict." Id. Then, in a separate sentencing hearing, the judge weighs the aggravating and mitigating factors to arrive at a sentence. Ala. Code 1975 § 13A-5-47(a) et seq. In so doing, the judge must "consider" the jury's recommendation, but is not bound by it. See Ala. Code 1975 § 13A-5-47(e). In addition, the judge must issue, in writing, specific findings with regard to each of the aggravating and mitigating factors that lead to the sentence. See Ala. Code 1975 § 13A-5-47(d).

There is no dispute in this case that the sentencing judge did not find the

HAC factor; the judge determined that a single aggravating factor—that Fortenberry committed murder in the course of a robbery—outweighed the mitigating factors presented in the case. Although the prosecution did not waive the HAC factor at the hearing before the sentencing judge, it pointed out to the judge that it thought that the robbery factor would be sufficient to outweigh the mitigating evidence, and that the judge did not need to find the HAC factor in order to sentence Fortenberry to death. The sentencing judge obviously agreed, issuing the following written sentence:

> From the evidence presented at the trial and at the sentence hearing and from a review of the pre-sentence investigation report, the Court finds that the Defendant, Tommy J. Fortenberry, did intentionally murder two or more persons, being Wilbur T. Nelson, Ronald Michael Guest, Robert William Payne, and Nancy Payne, by one act or pursuant to one scheme or course of conduct. The Court further finds that the Defendant, Tommy J. Fortenberry, did intentionally murder Wilbur T. Nelson during a robbery in the first degree. The Court further finds as a statutory aggravating circumstance, that the intentional murder was committed while the Defendant was engaged in the commission of a robbery in the first degree.

> The Court in considering and weighing mitigating circumstances, finds that the Defendant has no significant history of prior criminal activity, having only one (1) prior conviction for Burglary third degree. The Court finds no evidence that the Defendant was acting under the influence of extreme mental or emotional disturbance or that he lacked the capacity to appreciate the criminality of his conduct or to conform to the requirements of law. The Court further finds no evidence that the victims participated in the Defendant's conduct or consented to it or that the Defendant was an accomplice to another who committed the offense and that his participation was relatively minor. The Court further finds no evidence that the Defendant acted under duress or under the substantial domination of another person.

> The age of the Defendant at the time of the commission of the

18

crime was twenty (20) years of age and the Court determines that this is a mitigating circumstance to be considered and weighed. In addition to consideration of the statutory mitigating circumstances, the Court finds that the Defendant has studied for and become licensed as a practical nurse. The Court specifically determines the Defendant's training and licensing as a nurse is a mitigating circumstance which is herein considered and weighed.

The Court finds from a consideration of the evidence taken on the trial of the case and at the sentencing hearing that the aggravating circumstance listed in Section 13A-5-49(4) exists in this case and is sufficient to support the sentence of death. It is the opinion of the Court that the mitigating circumstances heretofore enumerated are insufficient to outweigh the aggravating circumstance. The Court therefore, finds that the punishment of this Defendant should be fixed by the Court at death.

Fortenberry v. State, 545 So. 2d 129, 143 (Ala. Crim. App. 1988) (citations omitted).

Relying on Espinosa v. Florida, 505 U.S. 1079 (1992), Fortenberry argues that despite the judge's sentencing order, counsel was nonetheless ineffective for failing to challenge the HAC instruction. In Espinosa, the Supreme Court held that, in a state that places sentencing authority in more than one actor, the sentencing judge's proper re-weighing of aggravating factors is insufficient to cure constitutional defects in the sentencing jury's consideration of an improper aggravating factor. Id. at 1082–83. Instead, jury consideration of an improper factor is imputed to the sentencing judge. Fortenberry argues that the jury was wrongly instructed with regard to the HAC aggravating factor, and therefore, Espinosa would mandate reversal of his conviction if he could overcome the procedural default.

This argument falters because the Supreme Court has held that Espinosa

19

announced a new rule that cannot be applied retroactively to cases on collateral review. See Lambrix v. Singletary, 520 U.S. 518 (1997). Because Fortenberry's conviction became final before Espinosa, his Espinosa claim is thus Teague-barred. See id.; Teague v. Lane, 489 U.S. 288, 310 (1989). Therefore in this case, even assuming that the jury was improperly instructed to consider an unconstitutional HAC instruction, that error is not prejudicial if the sentencing judge properly re-weighed only the constitutionally applicable factors. See Glock v. Singletary, 65 F.3d 878, 880, 882–83 (11th Cir. 1995) (en banc).[7]

Because the trial court found the existence of only one statutory aggravating circumstance—that "[t]he capital offense was committed while the defendant was engaged in the commission of . . . robbery"—we must conclude that the HAC factor played no role in Fortenberry's sentence.[8] Therefore, defense counsel's

---

[7]We assume arguendo that Espinosa applies to the Alabama death penalty statute. As the Supreme Court explained in Harris v. Alabama, 513 U.S. 504, 509 (1995), the current Alabama scheme differs from the Florida scheme Espinosa considered in that Florida requires the judge to give the jury's recommendation "great weight" in reaching a conclusion as to the proper sentence, while in Alabama the judge need only "consider" the jury's recommendation. Ala. Code 1975 § 13A-5-47(e). Although the applicability of Espinosa was not at issue in Harris, the Supreme Court went on to explain that consequential Espinosa "error attaches whenever the jury recommendation is considered in the process, not only when it is given great weight by the judge." Id. at 513. This strongly suggests that Espinosa applies to Alabama's death penalty statute even though in Alabama the jury has less "capital sentencing authority" than it has in Florida. Espinosa, 505 U.S. at 1082; but see Glock, 65 F.3d at 883 ("to put Espinosa's rule another way, a trial judge in a trifurcated sentencing procedure may not cure the jury's consideration of an invalid circumstance if, as in Florida, the trial judge owes the jury deference.").

[8]Ala. Code § 13A-5-47(d) specifically directs that

Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant

20

failure to object to the HAC instruction at trial or to raise the issue on appeal were ultimately inconsequential.

3.    Ineffective Assistance of Counsel

Under the Sixth Amendment, a criminal defendant is entitled to receive effective assistance of counsel in conducting a defense.  In order to show a violation of this right sufficient to merit reversal, a defendant must satisfy the familiar two-prong test that the Supreme Court articulated in Strickland v. Washington, 466 U.S. 668, 687 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Under this test, the proper standard for attorney performance is that of "reasonably effective assistance"—conduct we evaluate on the facts of the particular case, as viewed at the time of counsel's actions, to determine if the performance fell within the wide "range of professionally competent assistance."  Id. at 687, 690.  With regard to the second prong of the test, Strickland explains that prejudice exists where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 690.

to Section 13A-5-52.  The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it.

In light of this requirement, we could not possibly find that the sentencing judge used the HAC factor to arrive at Fortenberry's sentence.

21

Most of Fortenberry's allegations of ineffective assistance concern defense counsel's alleged failure to perform an adequate investigation prior to trial, a duty Strickland addresses with specificity. Strickland explains that

> counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 691.[9]

In this case, Fortenberry argues that he received ineffective assistance during both the guilt and penalty phases of his trial. We consider these claims separately.

### A. Guilt Phase

Fortenberry first asserts that his attorneys were ineffective during the guilt phase of his trial because they failed to investigate Harvey Underwood, and because they failed to investigate and present exculpatory evidence from various potential witnesses whom they would have discovered had they investigated Underwood. In particular, Fortenberry contends that, had Buttram and Harrison conducted an adequate investigation, they would have uncovered three

---

[9]An attorney has a duty to investigate "the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." A.B.A. Standards for Criminal Justice 4-4.1 (3d ed. 1993). Furthermore,

> The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.

Id.

witnesses—Tammy McCoy, Philip Shadwrick, and William Pruitt—all of whom testified during the Rule 20 proceedings that Underwood admitted to them that he had committed the Guest Service Station murders.

McCoy testified that she had known Fortenberry and Underwood since childhood, and that Underwood confessed to her three or four weeks after the murders. She explained that Underwood had threatened to kill her and her children if she spoke to anyone about it, so she kept the secret until she finally revealed the confession to Buttram in 1991. Shadwrick and Pruitt testified that Underwood confessed to them while they were sitting around drinking in the woods.

Fortenberry next asserts that, had trial counsel performed an adequate investigation, they would have uncovered and called to testify the allegedly exculpatory witnesses Rachel Parks, Donna Ogle, and Willard Yates. The record shows that defense counsel obtained the names of these witnesses on the Friday before the trial on Monday, and that they attempted without success to subpoena them. At the Rule 20 hearing, Parks and Ogle both testified that they had approached the Guest Station shortly after the crime, and observed two people in a blue truck travelling at great speed in the opposite direction.[10] Yates testified that when he arrived at the station, Alvis Guest told him that it did not look like a robbery had occurred because Nelson, the cashier, still had money in his pocket and there was still money in the cash drawer. This testimony would have been

---

[10]This testimony would have been important, according to Fortenberry, because in his confessions, Fortenberry stated that he and Underwood had gone to the Guest Service Station in Fortenberry's brother's green and white truck, while in his several denials he stated that they had taken a different vehicle.

crucial, Fortenberry claims, because it would have contradicted Alvis Guest's trial testimony that a robbery had occurred.

Finally, Fortenberry faults trial counsel's handling of Tracy Henry Wood, who was the only witness at the murder scene. Prior to trial, defense counsel had obtained Wood's police statement, which contained a description of an unidentified man at the scene who was tall, tanned, with a large stomach and sandy hair. At trial, Wood gave a similar description. According to Fortenberry, trial counsel knew that this description did not match Fortenberry; yet they did not interview Wood before trial. When they did interview her prior to her testimony, trial counsel chose not to show her a photograph or composite sketch of Underwood, even though they believed at the time that Underwood was the murderer. Fortenberry avers that these actions amounted to ineffective assistance of counsel entitling him to a reversal of his conviction.

In general, defense counsel renders ineffective assistance when it fails to investigate adequately the sole strategy for a defense or to prepare evidence to support that defense. See Code v. Montgomery, 799 F.2d 1481, 1483-84 (11th Cir. 1986). The duty to investigate requires that counsel "conduct a substantial investigation into any of his client's plausible lines of defense." House v. Balcom, 725 F.2d 608, 617-18 (11th Cir. 1984). Although a defendant's actions or directions may in some instances render a failure to investigate reasonable, see Strickland, 466 U.S. at 691, there is no per se rule absolving counsel of its duty to examine facts simply because a defendant suggests another course. See

24

Thompson v. Wainwright, 787 F.2d 1447, 1451 (11th Cir. 1986) ("[Attorney's] explanation that he did not investigate potential mitigating evidence because of Thompson's request is especially disturbing in this case where [attorney] himself believed that [defendant] had mental difficulties."). Indeed, even when a defendant tells his attorney that he wishes to plead guilty, defense counsel must still make an independent examination of the facts and circumstances of the case. See Agan v. Singletary, 12 F.3d 1012, 1018 (11th Cir. 1994) (finding defense counsel ineffective where it failed to investigate conflicting statements to police suggesting possibility that defendant was accepting blame for murder to cover for actual murderer, despite defendant's guilty plea). Specifically, we have held assistance ineffective when counsel ignored "red flags" that any reasonable attorney would have perceived to demand further investigation. See Cunningham v. Zant, 928 F.2d 1006, 1018 (11th Cir. 1991).

Alabama argues that trial counsel's failure to investigate Underwood more fully cannot have been ineffective assistance of counsel, because up until the eve of the trial Fortenberry maintained his own guilt, and the reasonableness of the investigation was therefore "determined or substantially influenced by the defendant's own statements or actions." Strickland, 466 U.S. at 691. Fortenberry answers that his trial counsel never believed that he had committed the murders, and suspected all along that his admission was an attempt to cover for someone else.[11] Fortenberry argues that because trial counsel knew that Fortenberry had

---

[11]Harrison and Buttram testified in the Rule 20 proceedings that they had not believed Fortenberry's statements that he had committed the murders, and that they always thought that

25

pointed to Underwood in some of his statements to the police, it was unreasonable not to investigate Underwood's possible role even though Fortenberry claimed to be guilty. Moreover, Fortenberry points out that when, on the eve of the trial, he eventually told his counsel that he was innocent, counsel still failed to investigate Underwood.

Whether or not defense counsel's investigation was in fact unreasonable under Strickland, we find that the testimony Fortenberry argues should have been discovered and offered to the jury is insufficient to undermine confidence in his conviction. See Strickland, 466 U.S. at 694 (explaining that a "reasonable probability" of a different result is a probability sufficient to undermine confidence in the outcome of the case). First, Tammy McCoy's testimony shows that she did not reveal Underwood's alleged confession until many years after Fortenberry's conviction, and Fortenberry has not shown that a reasonable investigation of Underwood would have uncovered her. Second, as the district court noted, the Rule 20 court determined that Shadwrick and Pruitt were unreliable witnesses. This determination is presumed correct,[12] and therefore their testimony will not

he was covering up for someone else.

[12]The pre-AEDPA version of 28 U.S.C. § 2254 stated that

(e) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit--
    (1) that the merits of the factual dispute were not resolved in the State court

26

support a reversal of Fortenberry's conviction.[13]  Third, Parks and Ogle's

---

hearing;
 (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
 (3) that the material facts were not adequately developed at the State court hearing;
 (4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
 (5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
 (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
 (7) that the applicant was otherwise denied due process of law in the State court proceeding;
 (8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:
 And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

[13]Fortenberry also argues that the district court erred when it denied his request for an evidentiary hearing to determine when Underwood's alleged confession to Shadwick and Pruitt occurred.  The district court relied on the Rule 20 court's finding that "there ha[d] been no showing that the testimony of [Pruitt] concerned an event which pre-dated the defendant's trial." Fortenberry argues that this conclusion is flawed for two reasons.  First, he contends that the Rule 20 court's findings are not supported by the record as a whole, and that in fact the record makes clear that Underwood confessed to Pruitt in 1985, before Fortenberry's trial.  Thus, he argues, the Rule 20 court's findings are not entitled to a presumption of correctness.  See Townsend v. Sain, 372 U.S. 293 (1963).  Second, Fortenberry argues that the Rule 20 court simply adopted the state's proposed findings of fact, and that therefore there was no credible independent judicial determination regarding the issue.  In addition, Fortenberry states that the district court's own analysis, in which it stated that "it is not clear from the evidence . . . that Underwood made this alleged admission before the petitioner's trial . . ."

---

means that the court should have held a hearing to resolve the issue.  Id.  After reviewing the Rule 20 record, we conclude that the factual determination is supported by the record as a whole. Fortenberry is therefore not entitled to an evidentiary hearing on this issue.

testimony regarding the color of the truck they passed on the road is simply too insubstantial to create any doubt in Fortenberry's conviction. Fourth, although Yates would have testified that he had heard Guest make a statement suggesting that no robbery had taken place, there was conclusive evidence produced at trial that a robbery had occurred; thus, the absence of Yates' testimony is unlikely to have produced a different outcome. Last, there is no evidence that Tracy Henry Wood would have provided any additional or different testimony even had trial counsel interviewed her prior to the beginning of the trial. Defense counsel did interview prior to her testimony and cross examined her fully at trial, and the alleged failure to interview her earlier was indisputably inconsequential.

It is worth reiterating that the absence of exculpatory witness testimony from a defense is more likely prejudicial when a conviction is based on little record evidence of guilt. See Strickland, 466 U.S. at 695–96 ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). In this case, although there was no conclusive forensic or eyewitness evidence establishing Fortenberry's guilt, the jury had before it Fortenberry's multiple uncoerced confessions, along with strong evidence that placed him in possession of the murder weapon. We find that no reasonable likelihood that the jury would have discredited this evidence had it heard the testimony Fortenberry says his lawyers should have discovered and presented. Accordingly, we find that trial counsel's alleged failure to perform an adequate investigation of Underwood did not prejudice Fortenberry's conviction.

B.    Sentencing Phase

Fortenberry next asserts that his counsel were ineffective during the sentencing phase of his trial because they failed to investigate and discover mitigating evidence about Fortenberry's psychological problems, alcoholism and good character.  In addition, Fortenberry points to defense counsel's failure at the sentencing phase to present the scant mitigating evidence they did discover: defense counsel presented only fourteen lines of unprepared testimony from Fortenberry's father—testimony that was itself cumulative of evidence already presented during the guilt phase.[14]

As with a claim of ineffectiveness during the guilt phase, to succeed on a claim of ineffective assistance during the penalty phase a petitioner must show both deficient performance and prejudice under Strickland.  See Williams v. Taylor, 529 U.S. 362, 390 (2000); Lambrix v. Singletary, 72 F.3d 1500, 1504 (11th Cir. 1996).  The Supreme Court explained in Williams that where a petitioner's counsel was deficient at sentencing, the relevant question for determining prejudice is whether the

> entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence.

529 U.S. at 399 (internal marks omitted).

---

[14]Testimony presented during the trial showed Fortenberry's age, his lack of a significant prior criminal record, and that he was a nursing student.  At the penalty phase, trial counsel adopted this evidence, and then elicited testimony from Fortenberry's father that showed the same facts.

Trial counsel's performance is deficient if counsel fails to make a reasonable investigation of possible mitigating evidence in preparation for the penalty phase of a capital trial. See Lambrix v. Singletary, 72 F.3d 1500, 1504 (11th Cir. 1996); Thompson v. Wainwright, 787 F.2d 1447, 1451 (11th Cir. 1986). Counsel's performance is unreasonable where counsel fails altogether to make an investigation, or where counsel makes only a desultory or cursory effort to find mitigating evidence. See Lambrix, 72 F.3d at 1504; Armstrong v. Dugger, 833 F.2d 1430, 1433 (11th Cir. 1987) (counsel's investigation consisted only of consultation with probation officer and one interview with defendant and parents)).

Under some circumstances, reasonable strategic considerations may convince an attorney that presentation of mitigation evidence would be unfruitful or even harmful. Thus, for example, in Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc), we held that trial counsel had reasonably made the decision to present some but not all of the available mitigating evidence. Strategic considerations may even reasonably lead defense counsel to conclude that presenting no mitigating evidence is to the defendant's benefit. For example, in Burger v. Kemp, 483 U.S. 776 (1987), the Supreme Court denied an ineffective assistance claim where defense counsel had concluded, based on sound professional judgment and substantial investigation, that the petitioner's interest would not be served by presenting the available mitigating evidence. Most recently, in Bell v. Cone, the Supreme Court recently upheld a state court determination that defense counsel's decision to present no mitigation evidence or

30

closing argument at the sentencing stage was not objectively unreasonable, where defense counsel was fearful that presenting mitigating evidence would present the prosecution an opportunity to put on a damaging attack. 122 S. Ct. 1843, 1854 (2002).

Absent any viable strategic reason, however, the failure to present available mitigating evidence renders assistance constitutionally ineffective. For example, in Collier v. Turpin, 177 F.3d 1184, 1201 (11th Cir. 1999), we found trial counsel's actual presentation of mitigation evidence deficient where trial counsel called ten witnesses but elicited "very little relevant evidence about [petitioner's] character." Similarly, in Blanco v. Singletary, 943 F.2d 1477 (11th Cir. 1991), we explained that in order to determine if a failure to present mitigating evidence is reasonable

> it must be determined whether a reasonable investigation should have uncovered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end.

Id. at 1500 (quoting Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir. 1988) (emphasis in original; citation omitted)). We determined that the failure to present available evidence was not based on a tactical decision, and that the performance was sufficiently deficient so as to require granting relief. The facts of Blanco are similar enough to those of the present case that they are worth recounting here:

> Following the jury's guilty verdict, defense counsel Rodriguez informed the court that he was not prepared for the penalty phase and needed a continuance to locate witnesses. The trial court stated that he had previously informed counsel that the sentencing phase would commence immediately after the guilt phase was completed. The trial

31

court nevertheless continued the trial for four days, informing the jury that Blanco needed time to produce witnesses.

The next court proceedings were held on the evening before the sentencing phase was to begin. During this charge conference, the trial court queried counsel and Blanco as to the efforts that had been made to locate witnesses. The transcript of the charge conference and attorney Rodriguez' testimony at the collateral hearings are not clear as to what further steps, if any, counsel took over the four-day continuance. Although counsel did attempt to subpoena Blanco's brother to testify, it appears that counsel for the most part waited for the witnesses that Blanco and counsel previously had attempted to contact during an overnight recess in the guilt phase to return their calls . . . . Counsel never managed to meet with any of these witnesses over the continuance to determine what their testimony might be. With the exception of Blanco's brother, counsel had not talked to any of these witnesses. The record reflects that counsel and Blanco had further conversations concerning the witnesses who would be called during sentencing, and that Blanco indicated he did not want any evidence offered on his behalf . . . . Counsel essentially acquiesced in Blanco's defeatism without knowing what evidence Blanco was foregoing. Counsel therefore could not have advised Blanco fully as to the consequences of his choice not to put on any mitigation evidence.

Blanco, 943 F.2d at 1500–1501 (notes omitted).

The circumstances of the present case lead us to conclude that trial counsel's failure adequately to investigate or present mitigating evidence was unreasonable. The jury convicted Fortenberry at approximately 6:01 on a Saturday evening. At that time, the trial court informed the jury that the court would not be in session on Sunday, and that the jury would be required to return the following Monday if no sentence was obtained right away. The jury indicated that it was ready and able to proceed. Trial counsel immediately moved for a continuance until the following Monday. In support of its request, trial counsel cited the late hour and fatigue, and more importantly, trial counsel specifically stated that they were not prepared.

32

Trial counsel reiterated this later when, in a renewed request for a continuance, Harrison stated, "And we would renew our motion for a continuance on the grounds stated earlier, on the basis that we have not had sufficient time to prepare any evidence or argument for this phase of the trial." Nonetheless, the trial court denied the request for a continuance.

Regardless of whether the trial court should have granted a continuance to allow defense counsel to prepare,[15] defense counsel should have known that a sentencing hearing might follow close on the heels of a conviction. Any reasonable attorney would have prepared at least a minimal penalty case before the conclusion of the guilt phase of the trial. Here, the trial transcript shows that Fortenberry's attorneys failed to present any useful mitigating evidence to the jury beyond what had come out during the guilt phase. Unlike even the performance of defense counsel in Williams, where the "record establishe[d] that counsel did not begin to prepare for that phase of the proceeding until a week before the trial," here the record shows that trial counsel spent virtually no time preparing for the penalty phase. This neglect was not based on a tactical decision by trial counsel; as they told the court in requesting a continuance, "we have not had sufficient time to prepare any evidence or argument for this phase of the trial." Thus, as was true in Blanco, Fortenberry's trial counsel did not interview or prepare a single witness prior to the hearing; the only witness who did testify on Fortenberry's behalf, his

_____

[15]We note that the Alabama courts determined that the trial court did not abuse its discretion by refusing to grant a continuance, and Fortenberry does not challenge that determination here.

33

father, stated at the Rule 20 hearing that he had no idea why he was testifying or what was the purpose of the sentencing hearing.

The lack of preparation is evident in the trial transcript. After telling the court that it was adopting those mitigating factors proved during the guilt phase—which included that Fortenberry was young when he committed the murders, that he lacked a significant criminal record, and that he was a nursing-school graduate—defense counsel called Fortenberry's father to testify. The following is the totality of all the testimony presented in the penalty phase on Fortenberry's behalf:

Q:     Would you state your name, please, sir?
A:     Jerry Verben Fortenberry.
Q:     And you are Tommy Fortenberry's father?
A:     Yes, sir, I am.
Q:     And Mr. Fortenberry, do you know how old your son is right now?
A:     Yes, sir, he was twenty-two yesterday.
Q:     Twenty-two yesterday?
A:     Yes, sir.
Q:     And how old would your son have been in August of 1984?
A:     Nineteen.
Q:     Now, has your son graduated from high school?
A:     Yes, sir.
Q:     What high school?
A:     Emma Sansom.
Q:     Has he had any education or training since then?
A:     Yes, sir, we went through nursing school together, graduated together.
Q:     You went through nursing school together?
A:     Yes, sir.
Q:     When did you graduate?
A:     In 1984.
Q:     Do you remember the month?
A:     I am rather shook up right now, no, sir.
Q:     Okay, but it was in 1984?
A:     Yes, sir.
Q:     Do you know if your son has had any convictions as an adult before he got in this trouble?

34

A:     He had—you know, he was a minor, he did, but nothing as an adult.
Q:     All right. And he did graduate from nursing school?
A:     Yes, sir, he did.
Q:     Did your son take his state boards to be a nurse after school?
A:     Yes, sir, he did.
Q:     Do you know if he passed that?
A:     Yes, sir, he did, eventually passed the state boards.
Q:     He is a licensed practical nurse?
A:     Yes, sir, he is.
Q:     I think that's all.

As we have stressed before, "[t]he purpose of a sentencing hearing is to provide the [sentencer] the information necessary for it to render an individualized sentencing determination . . . [based upon] the character and record of the individualized offender and the circumstances of the particular offense." Collier v. Turpin, 177 F.3d at 1202. See also Dobbs v. Turpin, 142 F.3d 1383, 1386–87 (11th Cir. 1998); Cunningham v. Zant, 928 F.2d 1006, 1019 (11th Cir. 1991). Despite the fact that his father was Fortenberry's only character witness, trial counsel failed to ask any questions that might have conveyed to the jury any sense of "what type of person [Fortenberry] was." Fortenberry's father testified at the Rule 20 hearing that defense counsel had not interviewed him in advance, advised him that he would be called, prepared him to testify, or even explained the procedure of the sentencing phase to him. Rather than elicit testimony that might have conveyed a sense of Fortenberry's "character and record," Collier, 177 F.3d at 1202, to offset the apparently aberrational events of the night of the murders, trial counsel simply asked questions regarding information that had been shown during the guilt phase. Even the prosecution acknowledged the lack of mitigation evidence by stating, "We submit that there haven't been, he hasn't offered anything outside of a

35

grieving father." Thus, the record reveals that counsel's actual performance during the sentencing phase was deficient.

Despite our conclusion that Fortenberry received ineffective assistance at the penalty phase, we are unable to find prejudice in this case, because there is nothing in the record that we can consider to support Fortenberry's assertion that with adequate representation he would have presented additional mitigating evidence sufficient to undermine confidence in his conviction. Fortenberry argues that had trial counsel effectively represented him, they would have located and proffered the testimony of additional family members, friends, high school and nursing school classmates, and that had these witnesses been called, the jury would have heard testimony of Fortenberry's accomplishments and acts of kindness. In support, Fortenberry attempted to present to the district court affidavits from a number of witnesses to substantiate the availability of this mitigating evidence. We do not doubt that these witnesses would have testified on Fortenberry's behalf. The district court, however, correctly held that under Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992), Fortenberry is not entitled to an evidentiary hearing on these affidavits without a showing of cause and prejudice, because they are material facts not presented or adequately developed at the state-court hearing,[16] and, thus, we cannot consider them in our prejudice analysis.

---

[16]Fortenberry responds that the affidavits are new evidence, and thus that he is entitled to a hearing under Townsend, 372 U.S. at 317 ("Where newly discovered evidence is alleged in a habeas application, evidence which could not reasonably have been presented to the state trier of facts, the federal court must grant an evidentiary hearing."). Fortenberry does not even attempt, however, to explain why these affidavits could not reasonably have been presented to the state habeas court; therefore, the district court did not err in declining to hold an evidentiary hearing to consider them and we cannot consider them here.

In addition, Fortenberry argues that trial counsel should have presented evidence from the Lunacy Commission Report ordered to determine Fortenberry's competency to stand trial, prepared by Taylor Hardin Hospital ("Taylor Hardin Report"). That report showed that Fortenberry had been an alcoholic who drank for most of his life, and also revealed "significant psychological problems" and a personality disorder characterized by lack of judgment and poor self control. We cannot say that the nature of this evidence is likely to have altered the sentence in this case. Fortenberry has not provided any other evidence of what his counsel could have presented during the sentencing phase that might have altered the result. As a consequence, we cannot say that Fortenberry was prejudiced by counsel's allegedly ineffective performance at the sentencing phase.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Fortenberry's petition for writ of habeas corpus.

**AFFIRMED**.

ANDERSON, Circuit Judge, concurring:

I concur in all of the opinion for the court, except that portion addressing the performance prong of the analysis of ineffective assistance of counsel at the sentencing phase.  Because Fortenberry cannot satisfy the prejudice prong, as pointed out by the court's opinion, I need not address the performance prong.