# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2023 ND 150

Cassandra Black Elk,                                          Petitioner and Appellee

v.

State of North Dakota,                                      Respondent and Appellant

## No. 20230035

Appeal from the District Court of Burleigh County, South Central Judicial District, the Honorable Daniel J. Borgen, Judge.

AFFIRMED.

Opinion of the Court by Jensen, Chief Justice, in which Justices Crothers, Tufte, and Bahr joined. Justice McEvers filed an opinion concurring in the result.

Mark R. Bradford (argued), Bloomington, MN, James R. Mayer (appeared), Minneapolis, MN, and Ryan D. Sandberg (appeared), Minot, ND, for petitioner and appellee.

David L. Rappenecker, Assistant State's Attorney, Bismarck, ND, for the respondent and appellant.

**Jensen, Chief Justice.**

[¶1] The State appeals from a district court's judgment granting post-conviction relief to Cassandra Black Elk. The State argues the court erred by relying on hearsay testimony and in finding defense counsel's conduct fell below an objective standard of reasonableness when counsel advised Black Elk she could deal with the not yet disclosed results of an autopsy after her guilty plea had been entered and accepted. The court also determined Black Elk would not have pled guilty but for this improper advice from counsel. We affirm.

I

[¶2] On February 22, 2022, the State charged Black Elk with child neglect under N.D.C.C. § 14-09-22.1(1), a class C felony, in relation to the death of her infant daughter, S.B. The State alleged that Black Elk willfully "failed to provide proper parental care or control for S.B. by consuming alcohol to a level that impaired her ability to care for S.B. and S.B. died due to the lack of appropriate care." On May 13, 2022, acting on advice of counsel, Black Elk pled guilty to the offense charged.

[¶3] A preliminary autopsy of the infant was completed on February 22, 2022, but was not released until May 27, 2022. The autopsy report concluded there was "[n]o evidence of foul play or recent significant trauma[.]" The report further identified the cause of death as "Unexplained Sudden Death" and the manner of death "Undetermined."

[¶4] Black Elk applied for post-conviction relief arguing the autopsy report was newly discovered evidence, asserting she received ineffective assistance of counsel, and asserting a Brady violation claiming the State's Attorney knew the exculpatory nature of the result of the autopsy prior to its release and prior to Black Elk's change of plea, but did not disclose the information. During an evidentiary hearing on her petition, Black Elk testified her defense counsel advised her they could deal with any findings from the autopsy report after she

1

pled guilty. The district court granted the petition finding defense counsel was objectively ineffective, and Black Elk's plea was not knowingly and intelligently made. The court did not rule on Black Elk's newly discovered evidence claim or the Brady violation claim.

## II

[¶5] Post-conviction relief may be granted if the "conviction was obtained . . . in violation of the laws or the Constitution of the United States or of the laws or Constitution of North Dakota" or if newly discovered evidence establishes a petitioner's innocence. N.D.C.C. § 29-32.1-01(1)(a), (3)(a)(1). "Post-conviction relief proceedings are civil in nature and are governed by the North Dakota Rules of Civil Procedure." *Addai v. State*, 2022 ND 190, ¶ 6, 982 N.W.2d 287 (quoting *Parshall v. State*, 2018 ND 69, ¶ 5, 908 N.W.2d 434). The standard of review in post-conviction proceedings is well established:

> A trial court's findings of fact in a post-conviction proceeding will not be disturbed on appeal unless clearly erroneous under N.D.R.Civ.P. 52(a). A finding is clearly erroneous if it is induced by an erroneous view of the law, if it is not supported by any evidence, or if, although there is some evidence to support it, a reviewing court is left with a definite and firm conviction a mistake has been made. Questions of law are fully reviewable on appeal of a post-conviction proceeding.

*Hunter v. State*, 2020 ND 224, ¶ 11, 949 N.W.2d 841 (quoting *Brewer v. State*, 2019 ND 69, ¶ 4, 924 N.W.2d 87).

## III

[¶6] The State argues the district court erred by using hearsay when it referenced statements made by Black Elk about the advice her counsel provided before entering a guilty plea. The State did not object to Black Elk's statements made under oath at the evidentiary hearing.

[¶7] This Court has held that an evidentiary issue must be appropriately preserved before it can be reviewed on appeal:

A touchstone for an effective appeal on any issue is that the matter was appropriately raised in the district court so the court has an opportunity to intelligently rule on it. *E.g., State v. Chacano*, 2012 ND 113, ¶ 6, 817 N.W.2d 369; *State v. Thompson*, 2010 ND 10, ¶ 13, 777 N.W.2d 617; *see also* N.D.R.Ev. 103(a). Thus, a party who fails to timely object to admission of offered evidence may not challenge its admission on appeal[.]

*State v. Tresenriter*, 2012 ND 240, ¶ 9, 823 N.W.2d 774. This rule applies equally to civil cases as it does to criminal cases. *See Bell v. State*, 1998 ND 35, ¶ 34, 575 N.W.2d 211 ("[F]ailure to object at the time an alleged irregularity occurs acts as a waiver of the claim of error." (quoting *State v. Dymowski*, 459 N.W.2d 777, 780 (N.D. 1990))). *See also Matter of Honerud's Estate,* 294 N.W.2d 619, 622 (N.D. 1980) (finding an appellant's failure to object to a jury instruction was a waiver of that issue on appeal); *Bartholomay v. St. Thomas Lumber Co.*, 148 N.W.2d 278, 292 (N.D. 1966) (finding that an appellant's failure to object to a verdict form was a waiver of that issue on appeal); *Ackerman v. Fischer*, 54 N.W.2d 734, 736 (N.D. 1952) (finding an appellant's failure to motion for a new trial for alleged errors made by the trial court was a waiver of those errors on appeal). If a party wishes to preserve a claim of error as it relates to the admissibility of evidence, it must, on the record, object or move to strike the evidence, and state a specific ground for exclusion. N.D.R.Ev. 103(a)(1)(A)-(B).

[¶8]   The State urges this Court to adopt regular consideration of issues not preserved at post-conviction hearings if those issues arise from obvious error, a review we have exercised in criminal cases and is similar to the standard provided in N.D.R.Crim.P. 52(b). We decline to do so. In rare instances, this Court has considered issues not preserved in post-conviction proceedings. "When a forfeited plain error affects substantial rights, 'we have discretion to correct the error and should correct it if it seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Coppage v. State*, 2014 ND 42, ¶ 30, 843 N.W.2d 291 (quoting *State v. Chacano*, 2013 ND 8, ¶ 9, 826 N.W.2d 294). The State did not properly preserve its objection to the statements made by Black Elk.

3

[¶9] Black Elk can be tried again on the charges vacated by the post-conviction relief proceeding. The State has not provided any support for a determination that its substantial rights have been affected or that the alleged error seriously affects the fairness, integrity or public reputation of judicial proceedings. It is unnecessary for us to determine if Black Elk's testimony was admissible because under the circumstances of this case, we decline to exercise our discretion to address the alleged evidentiary error.

[¶10] The State attempts to avoid the necessity of having objected to the evidence to preserve the issue on appeal by arguing "[e]videntiary issues are examined differently depending on whether the underlying proceeding was a jury or nonjury proceeding." The State argues that because this was a nonjury proceeding a timely objection was not needed to stop the witness's testimony before it is heard by the jury, did not require an instruction by the judge to the jury to disregard the testimony, or an instruction to the jury to only consider the evidence for limited purposes. The State further argues, "[B]ecause hearsay statements can often be admitted for a non-hearsay purpose, and because of the preference for broadly admitting all evidence that is not clearly inadmissible, an objection to hearsay in a nonjury proceeding is far less necessary than in a jury trial." The State's arguments hearsay objections need not be raised in a nonjury proceeding lack merit.

[¶11] This Court has made a distinction between district courts admitting evidence in jury and nonjury proceedings noting that "[i]n a nonjury case, a trial judge should ordinarily admit all evidence which is not clearly inadmissible because a trial judge who is competent to rule upon the admissibility of evidence can distinguish between admissible and inadmissible evidence when deliberating upon the ultimate decision." *Healy v. Healy*, 397 N.W.2d 71, 74 (N.D. 1986). "Therefore, in a bench trial it is generally not reversible error for the court to admit incompetent evidence unless there is insufficient competent evidence to support an essential finding or unless the incompetent evidence induced the court to make an improper finding." *Id.* at 74-75. However, neither *Healy* nor similar cases hold a party is not required to raise hearsay objections in nonjury proceedings. To the contrary, this Court has plainly said, "[H]earsay evidence, if not objected to, may properly be used in a

4

court proceeding." *Zuo v. Wang*, 2019 ND 211, ¶ 15, 932 N.W.2d 360 (quoting *Sargent Cnty. Bank v. Wentworth*, 547 N.W.2d 753, 762 (N.D. 1996)).

[¶12] Under N.D.R.Ev. 103, the district court's decision to allow or exclude evidence will not be reversible error unless the party objected to the court's decision and the party's substantial rights were affected. *Command Ctr., Inc. v. Renewable Res., LLC*, 2021 ND 59, ¶ 22, 956 N.W.2d 755; *Westby v. Schmidt*, 2010 ND 44, ¶ 12, 779 N.W.2d 681. "A party must object at the time the alleged error occurs here to allow the district court to take appropriate action to remedy any prejudice that may have resulted." *Command Ctr.*, at ¶ 22 (quoting *Westby*, at ¶ 12). "If a party fails to object to the admission of testimony, the party waives the objection." *Westby*, at ¶ 12; *see also Meier v. Said*, 2007 ND 18, ¶ 18, 726 N.W.2d 852.

[¶13] The State alternatively argues it did not need to raise its hearsay objections because the evidence was admissible for other purposes. Under N.D.R.Ev. 105, "[i]f the court admits evidence that is admissible . . . for a purpose, but not . . . for another purpose, the court, *on timely request*, must restrict the evidence to its proper scope and instruct the jury accordingly." (Emphasis added.) *See, e.g.*, *Ebach v. Ralston*, 510 N.W.2d 604, 608 (N.D. 1994); *State v. Martinsons*, 462 N.W.2d 458, 460 (N.D. 1990). Although Rule 105 provides for instructing "the jury," one noted treatise explains the similar federal rule applies in court trials:

> Rule 105, though it speaks of instructing "the jury" applies in nonjury trials as well. Even when sitting without a jury, the judge must "restrict the evidence to its proper scope"; in other words, the judge cannot use evidence admitted for one purpose for the purpose of finding facts as to which the evidence is inadmissible. As in the case of other issues in court trials, appellate courts will presume the trial judge only used evidence admitted under Rule 105 for its proper purpose. But some constitutional rules of exclusion only apply in jury trials . . . .

21A Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5063.1 (2d ed. April 2023 Update) (footnotes omitted). *See also id.* § 5067 ("Rule 105 applies in court as well as jury trials. Though the

judge will not give herself limiting instructions, she is, nonetheless, under the same restrictions on the use of evidence admitted for a limited purpose as would limit a jury."). This treatise further explains a Rule 105 request and a Rule 103 objection serve similar functions:

> The writers frequently note that the request under Rule 105 serves a similar function to objections under Rule 103. By that, they mean that making a request triggers the duty of the trial judge to act as required by Rule 105 much as making an objection obligates the judge to enforce the rule being invoked. *In both cases, in the absence of a request for action, the trial judge commits no error by doing nothing and thus the party has no basis for an appeal.*

21A Wright & Graham, *supra*, § 5065 (footnotes omitted) (emphasis added).

[¶14] Here, the State did not object under N.D.R.Ev. 103 at the evidentiary hearing to Black Elk's statements about her legal counsel's advice. The State also did not make a timely request under N.D.R.Ev. 105 for the district court to limit the purpose for which the statements were admitted into evidence. "[I]f the opponent does nothing *the evidence comes in for all purposes*." 21A Wright & Graham, *supra*, § 5063.1 (emphasis added). The failure to objection was not abrogated by the fact the evidence may have been admissible for some purpose but not all purposes.

IV

[¶15] The State argued the district court improperly engaged in hindsight second-guessing when it found defense counsel to be ineffective because counsel did not know the results of the autopsy report when counsel advised Black Elk to plead guilty, and had he known, counsel would not have advised Black Elk to plead guilty. Post-conviction relief may be granted if a "conviction was obtained or the sentence was imposed in violation of the laws or the Constitution of the United States or of the laws or Constitution of North Dakota[.]" N.D.C.C. § 29-32.1-01(1)(a). One such violation of law is when a defendant does not receive counsel as guaranteed by the Sixth Amendment. "The question of ineffective assistance of counsel is a mixed question of law and fact and is fully reviewable on appeal." *Hunter*, 2020 ND 224, ¶ 11.

6

[¶16] "To succeed on a claim for ineffective assistance of counsel, the applicant must show: (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Hunter*, 2020 ND 224, ¶ 10 (citing *Rourke v. State*, 2018 ND 137, ¶ 5, 912 N.W.2d 311); *see also Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "To establish the first prong, the applicant must 'overcome the "strong presumption" that trial counsel's representation fell within the wide range of reasonable professional assistance, and courts must consciously attempt to limit the distorting effect of hindsight.'" *Hunter*, at ¶ 12 (quoting *Rourke*, at ¶ 5). "To establish the second prong, 'the defendant must specify how and where trial counsel was incompetent and the probable different result.'" *Id*. at ¶ 13 (quoting *Brewer*, 2019 ND 69, ¶ 9). "When a defendant pleads guilty on the advice of counsel, the defendant may only attack the voluntary and intelligent character of the guilty plea." *Abdi v. State*, 2021 ND 110, ¶ 10, 961 N.W.2d 303 (cleaned up). "The voluntariness of such a guilty plea turns on whether that advice was within the range of competence demanded of attorneys in criminal cases." *Damron v. State*, 2003 ND 102, ¶ 9, 663 N.W.2d 650 (cleaned up).

[¶17] The State's argument is misplaced because the content of the autopsy was not important to the district court's determination. As to the first prong of *Strickland*, the court found:

> [Defense counsel] advised his client that there was no reason to wait on the autopsy report before she entered her guilty plea because they could just "deal with it later." . . . the Court does find it unreasonable for [defense counsel] to offer such advice. It is not easy or simple to amend a sentence or withdraw a guilty plea once entered by the Court, such as evidenced by this entire case, as it was necessary to start an entirely new civil litigation in order to address the autopsy report. Therefore, the Court finds . . . [defense counsel's] conduct fell below the minimum standard required of a defense attorney.

It was defense counsel's advice that Black Elk could simply "deal" with the autopsy report later—no matter the result—when the legal options available

7

to her after pleading guilty were actually very complex, with no guarantee of relief, and would require a complicated withdrawal motion, criminal appeal, or post-conviction action. Black Elk relied on this misinformation to her detriment, and it was this advice that fell below an objective standard. Given how difficult it would be to deal with a material piece of evidence after a defendant has been sentenced, it was not error for the district court to determine the advice Black Elk's counsel provided fell below an objectively reasonable standard.

[¶18] As to the second prong of *Strickland*, the district court found:

> Ms. Black Elk argues, that had she received the autopsy report before pleading guilty, she would not have pled guilty to Child Neglect and would have proceeded to trial on the charges. The Court finds Ms. Black Elk's argument and logic reasonable. In the charging documents, it was alleged that Ms. Black Elk failed to provide proper parental care or control over S.B. by consuming alcohol to a level that impaired her ability to care for S.B. *and S.B. died due to a lack of appropriate care*. It is clear with the results of the autopsy report that Ms. Black Elk's conduct was not attributable to S.B.'s death.
>
> . . . .
>
> For these reasons, the Court finds had Ms. Black Elk received proper advice from counsel, she would not have entered her guilty plea[.]

[¶19] Black Elk's statements were consistent throughout the duration of the investigation, the charging process, and afterwards, that she wished to see the autopsy report, and wondered whether her infant died of Sudden Infant Death Syndrome. Black Elk testified to these facts at the evidentiary hearing. The district court relied on her testimony to find she would not have pled guilty, and would have taken the case to trial, had she known she would be unable to retract her guilty plea once the autopsy report showed the infant died from "Unexplained Sudden Death." The legal misinformation provided to her by defense counsel deprived Black Elk from an intelligent and voluntary plea as *Abdi* requires. The court's findings meet the stringent requirements under

*Strickland*, *Abdi*, and *Damron*. The court did not err in concluding Black Elk's counsel was ineffective.

V

[¶20] The State failed to object and assert Black Elk's testimony regarding the statements of her counsel were hearsay and we decline to review the issue on appeal. The district court's finding of ineffective assistance of counsel meets the factual and legal requirements under *Strickland*. The court's judgment granting post-conviction relief and vacating Black Elk's conviction is affirmed.

[¶21] Jon J. Jensen, C.J.
      Daniel J. Crothers
      Jerod E. Tufte
      Douglas A. Bahr

**McEvers, Justice, concurring in the result.**

[¶22] I agree with the majority that the judgment granting post-conviction relief should be affirmed. However, I do not agree with the majority that Black Elk met the burden for proving her counsel was ineffective. In my opinion, Black Elk has shown she is entitled to post-conviction relief based upon newly discovered evidence. Therefore, I would affirm the district court's judgment as right for the wrong reason.

[¶23] The district court should have granted Black Elk relief and allowed her to withdraw her guilty plea because under the circumstances she suffered a manifest injustice based on the newly discovered evidence rather than on the basis of ineffective assistance of counsel. *See Lindsey v. State*, 2014 ND 174, ¶ 15, 852 N.W.2d 383 (recognizing the Court does not set aside a correct result, if the result is the same under the correct reasoning). As set forth below, in my opinion, Black Elk's attorney was not objectively unreasonable based on what he knew at the time the advice was given. Advising a client to plead guilty before test results are revealed, and charges potentially increased, may be a sound legal strategy. It is only with the benefit of hindsight that the court could have found Black Elk's attorney ineffective.

[¶24] I begin with the standard for reviewing a claim for post-conviction relief. In *Abdi v. State,* we summarized the post-conviction requirements based on a claim of ineffective assistance of counsel:

> An applicant seeking to withdraw his plea based on a claim of ineffective assistance of counsel must surmount the *Strickland* test by showing: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This Court has stated:
>
>> When a defendant pleads guilty on the advice of counsel, the defendant "'may only attack the voluntary and intelligent character of the guilty plea.'" *Damron v. State*, 2003 ND 102, ¶ 9, 663 N.W.2d 650 (quoting *Tollett v. Henderson*, 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235, (1973)). Unless a defendant can prove "serious derelictions" on the part of the defendant's attorney that kept a plea from being knowingly and intelligently made, the defendant will be bound by that guilty plea. *Damron*, at ¶ 13 (citing *McMann v. Richardson*, 397 U.S. 759, 774, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). "In criminal cases, the defendant has the burden to present evidence to overcome the presumption that defense counsel is competent and adequate, and to do so, the defendant must point 'to specific errors made by trial counsel.'" *Damron*, at ¶ 13 (quoting *State v. Slapnicka*, 376 N.W.2d 33, 36 (N.D. 1985)).

*Lindsey v. State*, 2014 ND 174, ¶ 17, [ ]. An applicant for post-conviction relief bears a "heavy burden" to prevail on an ineffective assistance of counsel claim. *Bahtiraj v. State*, 2013 ND 240, ¶ 8, 840 N.W.2d 605.

[¶] Generally, to meet the first prong of *Strickland*, the applicant must "overcome the 'strong presumption' that trial counsel's representation fell within the wide range of reasonable professional assistance, and courts must consciously attempt to limit the distorting effect of hindsight." *Hunter v. State*, 2020 ND 224, ¶ 12, 949 N.W.2d 841. The first prong is measured against

"prevailing professional norms." *Bahtiraj*, 2013 ND 240, ¶ 10, 840 N.W.2d 605. . . .

2021 ND 110, ¶¶ 10-11, 961 N.W.2d 303.

[¶25] "The test for ineffectiveness is not whether counsel could have done more; perfection is not required." *Waters v. Thomas,* 46 F.3d 1506, 1518 (11th Cir. 1995). "A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance." *Atkins v. Singletary*, 965 F.2d 952, 960 (11th Cir. 1992).

[¶26] In reviewing a claim of ineffective assistance of counsel based on counsel's "serious dereliction," the following has been considered:

> Without "reasonably effective assistance of counsel in connection with the decision to plead guilty," a defendant cannot enter a knowing and voluntary plea because the plea does not represent an informed choice. *McCoy* [*v. Wainwright*], 804 F.2d [1196,] 1198 [(11th Cir. 1986)]; *Scott v. Wainwright*, 698 F.2d 427, 429 (11th Cir. 1983). Based upon his familiarity with the facts and law, defense counsel must advise the defendant. *Scott*, 698 F.2d at 429. "Counsel's advice need not be errorless, and need not involve every conceivable defense, no matter how peripheral to the normal focus of counsel's inquiry, but it must be within the realm of competence demanded of attorneys representing criminal defendants." *Id.* (emphasis added); *see McMann* [*v. Richardson*], 397 U.S. [759, 771 (1970)]; *Long* [*v. United States*], 883 F.2d [966,] 969 [(11th Cir. 1989)].

> The Supreme Court has recognized that the decision to plead guilty may occur without all of the state's evidence and necessarily takes place without knowledge of all facts revealed by witnesses at trial. *McMann*, 397 U.S. at 769-70 [ ]. "Counsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial." *Wofford v. Wainwright*, 748 F.2d 1505, 1508 (11th Cir. 1984) (per curiam); *Downs-Morgan v. United States*, 765 F.2d 1534, 1539 (11th Cir.

1985). An attorney's responsibility is to investigate and to evaluate his client's options in the course of the subject legal proceedings and then to advise the client as to the merits of each. *Tafero* [*v. Wainwright*], 796 F.2d [1314,] 1320 [(11th Cir. 1986)]; *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir. 1986). . . .

*Dunning v. United States*, No. 17-00174-WS, 2018 WL 1278912, at *6 (S.D. Ala. Feb. 20, 2018) (cleaned up).

[¶27] Assuming that everything Black Elk testified to at the post-conviction hearing was true, and I do not question her recollections, the remainder of the record should have been taken into consideration by the district court. Particularly when defense counsel did not testify at the evidentiary hearing, and as the original sentencing court, the court should have been aware of other circumstances in the record. The record reflects that Black Elk was charged on February 22, 2022, and bail was set at $25,000 cash only. Bond hearings were scheduled twice, in March 2022 and another in April 2022, but bond reduction was denied. The matter was scheduled for jury trial to begin on August 5, 2022. According to Black Elk's testimony on cross-examination, her attorney had negotiated a deal with the prosecutor who would soon leave employment of the State's Attorney's office:

> Q.     Well, you had a conversation about the fact that Ms. Vaagen was leaving, the prosecutor. Did he make any statements that he would rather settle this with Ms. Vaagen than with someone else?
>
> A.     Yes.
>
> Q.     Did he explain why?
>
> A.     Because that would be the best case scenario. He was telling her that I had a lot of remorse for what was going on and he talked her down originally from 2 years to 18 months.
>
> Q.     During your time with him, do you feel like he listened to you?

12

A. Yeah. I mean, he had no choice but to listen to me because I would just sit there and call him all the time, but then he would – I don't know if he ever – what he would do with it on his end, you know.

[¶28] At the time the plea agreement was entered, Black Elk had been in custody for 84 days. While she admitted she had been drinking on the night S.B. died and testified she admitted to law enforcement that her memory was foggy about the night before S.B.'s death, she maintained that she did nothing to harm her child. Black Elk asked repeatedly about the autopsy report, so she knew a report was pending. The amended information charged Black Elk with child neglect because she allegedly "failed to provide proper parental care or control for S.B. by consuming alcohol to a level that impaired her ability to care for S.B. and S.B. died due to lack of appropriate care." (Emphasis omitted.) In the written plea agreement, Black Elk, by sworn statement, indicated that she understood the charges, her rights, and the maximum penalty of five years imprisonment, a $10,000 fine, or both. She indicated:

> With full knowledge of my rights I desire to plead *guilty* to the above listed criminal charge. This written plea of guilty is given of my own free will without any coercion or pressure being placed upon me to enter a plea of guilty; nor have any promises been made to me except as stated herein.
>
> . . .
>
> I understand that by signing this document, I admit that I committed the crime of Child Neglect-Parental care in violation of N.D.C.C. 14-09-22.1(1)[.]
>
> I acknowledge that the following facts occurred which form the basis of my plea of guilty:
>
> That on or about February 19, 2022, in the County of Burleigh, State of North Dakota, I, Cassandra Jo Marvella Black Elk, did commit the crime of Child Neglect-parental care by willfully failing to provide proper parental care or control necessary for the physical health of S.B.

13

(Emphasis in the original.)

[¶29] Black Elk confirmed at the post-conviction hearing that her attorney did not force her or threaten her to sign this agreement. She testified that her attorney told her she should *think* about taking the deal before the Assistant State's Attorney who offered the plea deal resigned. However, she also testified that the police interview suggesting S.B.'s death was her fault contributed to her pleading guilty.

[¶30] However, after entering the plea and being sentenced, Black Elk continued to seek a copy of the autopsy report. Her first formal attempt to seek relief after receiving the autopsy report was a letter dated September 3, 2022, written to the district court asking for her sentence to be reduced under N.D.R.Crim.P. 35(b) based on the autopsy report. Her motion was denied without explanation.

[¶31] Her next attempt for relief was her application for post-conviction relief. In addition to the newly discovered evidence that shows a manifest injustice allowing her to withdraw her plea, she also alleged ineffective assistance of counsel. To overcome the first prong of *Strickland*, Black Elk had to show counsel's representation fell below an objective standard of reasonableness. Black Elk argued her attorney was ineffective for allowing her to plead guilty without first seeing the autopsy report and alleged her attorney was derelict in his investigation:

> This is an infant death case. S.B.'s death was presented as the primary support for the State's charge that Cassandra failed to provide necessary care. Law enforcement repeatedly accused Cassandra of being the instrument of her baby's death.
>
> Meanwhile, Cassandra maintained her innocence. Even under extreme duress, Cassandra was steadfast in her insistence that she had always taken proper care of S.B., and she had done nothing to cause her any harm.

14

Cassandra asked counsel again and again about the autopsy results and expressed her belief that they would help prove her innocence.

Defense counsel nevertheless advised Cassandra to plead guilty to the offense charged. When Cassandra expressed reservations about pleading guilty without seeing the autopsy results, counsel advised her that she was "thinking too far ahead" and suggested that a post-plea vindication by autopsy results was something they could simply deal with later.

Counsel's "we-will-cross-that-bridge-when-we-get-to-it" advice with regard to pleading guilty without autopsy results was objectively unreasonable.

Moreover, counsel's advice was not informed by any meaningful investigation. Though his client's felony charge included an allegation that she was responsible for her baby's death, counsel did not investigate the death. Counsel did not inform himself about the autopsy results before advising his client to plead guilty to the offense charged. Counsel did not consult with or retain any experts to test whether the State's allegations had any merit, or whether his client was telling the truth.

Counsel's conduct in urging Cassandra to plead guilty was not a legitimate strategic decision. Attorneys are only able to make legitimate strategic decisions after "a thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690-91. Under *Strickland*, "counsel has a duty to make reasonable investigations" and "in any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances." *Id.*

(Cleaned up.)

[¶32] Attached to Black Elk's amended petition for post-conviction relief was an affidavit from an attorney who Black Elk intended calling as an expert. While the district court did not allow the attorney to testify, the affidavit sets forth some of the evidence known to Black Elk's attorney at the time she pled guilty and tends to show that the advice was reasonable. The attorney stated:

I have reviewed the report of the interview with Cassandra, drafted by Investigator Masters. My characterization of this interview, in general, is that the police believed that someone, either Seth Eagle or Cassandra Black Elk, shook [S.B.] to death. They persisted in this belief, asking Cassandra repeatedly to implicate either herself or Seth Eagle in shaking [S.B.]. Cassandra consistently denied shaking or otherwise harming [S.B.], and did not implicate Seth in doing so, having [no] basis to believe he might have done so. Investigators continued to press Cassandra, attempting to get her to implicate herself or Seth Eagle. They used standard interrogation tropes in child-death cases. They attempted to sympathize with Cassandra, suggesting she was under a lot of stress and wasn't a bad person. They attempted to assume her guilt, consistently stating that they believed [S.B.] was shaken and that Cassandra wasn't telling them the whole truth.

. . .

Given the evidence, there is no clear proof beyond a reasonable doubt that would make a guilty plea obviously the best result for Cassandra Black Elk.

Given the evidence, there are two vital categories of information, which, at the time Cassandra Black Elk pleaded guilty, were missing. The first category of information was the autopsy report, which investigators consistently indicated to Cassandra they were anticipating and could reveal [S.B.]'s cause of death. The second category of information would have been the expert opinion of an expert in Shaken Baby Syndrome and related causes of infant death.

I believe that a criminal defense attorney would, at a minimum, seek to hire an expert in Shaken Baby Syndrome and related causes of infant death. Failure to do so in a case like this, in which no one has confessed to harming [S.B.] and in which there is no evidence, other than the child's death, of trauma, means that [S.B.]'s cause of death can only be uninformed guesswork.

[¶33] Respectfully, this theory misconstrues the standard under *Strickland* and shows Black Elk's attorney was reasonable rather than unreasonable. Black Elk testified the police detectives thought S.B. died from shaken baby

syndrome. Black Elk's attorney would have been under the impression there was a chance the autopsy could show S.B. was shaken. In *State v. McClary*, a case involving allegations of shaken baby syndrome, the State charged the defendant alternatively with murder under N.D.C.C. § 12.1-16-01(1)(b) and (c) for allegedly causing the infant's death under circumstances manifesting extreme indifference to the value of human life, "and/or" committing or attempting to commit a felony offense against a child under N.D.C.C. § 14-09-22 causing the infant's death. 2004 ND 98, ¶ 3, 679 N.W.2d 455. There was no reason for Black Elk's attorney to hire an expert on shaken baby syndrome because she was not charged with that conduct. But the possibility of the State amending the charge to a higher degree felony if the autopsy report showed shaken baby syndrome, and Black Elk consequently facing a much harsher sentence, may have been a consideration by her attorney. We will never know because neither party called him to testify. The district court did not allow Black Elk's expert witness to testify and hopefully did not allow this affidavit to become a large part of the court's consideration.

[¶34] What was unknown by Black Elk or her attorney at the time she pled guilty was what the autopsy would reveal. Would it show Black Elk's drinking or some other unknown conduct by her or someone else contributed to the child's death? If the report came back with inculpatory evidence, Black Elk could have been facing a longer sentence or perhaps even enhanced charges, and her attorney's advice would have proven sound. It is only after the autopsy report—in hindsight—that her attorney's advice is in question. It is reasonable to think the autopsy results may come back unfavorably, and a reasonable attorney in such a situation may think it is best to have a client plead guilty in order to receive a favorable plea deal. Although Black Elk's attorney may not have represented her perfectly in hindsight, perfect representation is not required—only reasonable representation.

[¶35] We recently reviewed a claim for ineffective assistance of counsel where the petitioner claimed his counsel was ineffective for not having forensic testing done on a weapon used in an attempted murder. *O'Neal v. State*, 2023 ND 109, ¶ 9, 992 N.W.2d 14. At the post-conviction hearing, O'Neal's counsel testified she did not request forensic testing because it would not have been

17

helpful to the defense and the State had sufficient evidence without the weapon to prove the case beyond a reasonable doubt. *Id*. Prior to the plea deal, O'Neal and his counsel had extensive discussions about the forensic testing and decided not to pursue this defense strategy. *Id*.

[¶36] While not completely on point, *O'Neal* shows there can be trial strategy in not requesting testing or not waiting for the results of testing. Similarly, in *Krogstad v. State*, we summarily affirmed on prong one of *Strickland* where an applicant argued he received ineffective assistance of counsel for failure to secure an independent DNA test. 2023 ND 30, ¶ 1, 985 N.W.2d 635. The trial attorney has no way of knowing for sure whether a client's claims of innocence are true or not. The client, being aware of his or her own conduct, is better able to decide whether to take a plea deal to avoid a more detrimental outcome if the matter goes to trial.

[¶37] I respectfully disagree with the majority that the content of the autopsy report was not important to the district court's determination. Majority, at ¶ 17. The court specifically found the results of the autopsy show Black Elk's conduct was not attributable to S.B.'s death to meet the prejudice prong. Had the report come out negatively for Black Elk, her attorney's advice would have had a positive result. As noted by Black Elk's petition, law enforcement was insinuating the evidence against her contained the possibility that S.B. was shaken, and that was the cause of her death. It appears the district court and the majority are using the results of the autopsy, and the prejudice caused to Black Elk based on the results, to determine the reasonableness of counsel's advice. This is a classic use of hindsight.

[¶38] I disagree that it is always difficult to deal with newly discovered evidence after the fact. Rather, the effectiveness of the evidence to meet the burden depends on the quality of the evidence in the autopsy report and whether it is exculpatory in order to create a manifest injustice. As to the district court's finding that it was unreasonable for counsel to advise they could "deal with it later," that is precisely what is happening here. I also disagree with the majority that Black Elk's legal options were "very complex." Majority, at ¶ 17. Whether by motion to withdraw a plea under Rule 11 or by post-

18

conviction relief, the process is not complex. I agree with the majority that doing so provided no guarantee of relief, because Black Elk would have to show a manifest injustice. I also agree with the district court and the majority that showing a manifest injustice is a high bar, but filing a motion or a petition for relief is not difficult.

[¶39] Reviewing the totality of the circumstances, we have a person in custody for 84 days awaiting trial under a great deal of personal stress who cannot fully remember the night in question. Black Elk knew the autopsy report was pending. She testified her attorney did not coerce her to plead guilty; rather he told her she should think about pleading guilty. Black Elk did not prove her plea was not voluntary based on her attorney's advice. In my opinion, the conduct of Black Elk's attorney fell into the wide range of reasonableness and therefore Black Elk did not satisfy prong one of *Strickland*. The district court should have granted Black Elk relief and allowed her to withdraw her guilty plea based on the newly discovered evidence rather than her ineffective assistance of counsel claim. Under N.D.C.C. § 29-32.1-01(1)(e), post-conviction relief is available when "[e]vidence, not previously presented and heard, exists requiring vacation of the conviction or sentence in the interest of justice." When an applicant for post-conviction relief seeks to withdraw a guilty plea, the applicant must demonstrate a "manifest injustice" justifying withdraw of his or her guilty plea. *Moore v. State*, 2007 ND 96, ¶ 10, 734 N.W.2d 336.

> The defendant must show (1) the evidence was discovered after the guilty plea, (2) the failure to learn about the evidence before the plea was not the result of the defendant's lack of diligence, (3) the newly discovered evidence is material to what would have been the issues at trial, and (4) the weight and quality of the newly discovered evidence would likely result in an acquittal at trial.

*Id.* at ¶ 12.

[¶40] We review a district court's decision on a motion for post-conviction relief based on newly discovered evidence for an abuse of discretion. *O'Neal*, 2023 ND 109, ¶ 4. "If the newly discovered evidence is of such a nature that it is not likely to be believed by the jury or to change the results of the original trial,

19

the court's denial of the new trial motion is not an abuse of discretion." *Id.* (quoting *Kovalevich v. State*, 2018 N.W.2d 184, ¶ 5, 915 N.W.2d 644).

[¶41] This is the test that would have applied to Black Elk's newly discovered evidence. While the district court chose not to address the claim of newly discovered evidence, if it had, the result would have been the same. The autopsy report, along with the testimony of the forensic pathologists who conducted and reviewed the autopsy, meets the criteria to allow Black Elk to withdraw her plea. Regarding prong one, not only was the evidence discovered after the guilty plea, the autopsy report did not even exist until after the guilty plea. *See O'Neal,* 2023 ND 109, ¶ 5 (noting that potential evidence is not evidence and the statutory threshold under N.D.C.C. § 29-32.1-01(1)(e) requires that the new evidence "exists"). On prong two, both Black Elk and her attorney requested the autopsy report, but at the time of her guilty plea, the report did not yet exist. Black Elk continued her diligence post guilty plea by pursuing the autopsy report. This meets the standard for prong two. Prongs three and four are met as Dr. Sens explained in "Exhibit A" that the evidence from the autopsy indicated an absence of criminality:

> We are concerned that a new infant death classification system is misinterpreted. We wish to clarify the intent and language used in these cases to prevent a catastrophic miscarriage of justice.
>
> . . .
>
> We cannot explain this death. There is absolutely no evidence of trauma. There are minor respiratory findings suggestive of a viral exposure. The sleeping conditions, while not ideal according to current standards, are better or identical to thousands of infants every day—infants who wake up without problems. There is some unconfirmed report of parental drinking prior to the death; . . . [T]his [drinking] may have been minimal or excessive. It does NOT contribute to the death of this child. This death is a tragic, unexplained loss of an infant. This death could not have been prevented based on the knowledge we have today.
>
> If an adult was so intoxicated that smothering occurred, different findings should be present at the autopsy. They were not. . . .

20

This death is UNEXPLAINED. Many infant deaths are. Medical knowledge and science have failed this infant and family; please do not compound it with a judicial action. This death, and deaths like it, are a significant public health issue, not a judicial one. This family suffered a tremendous loss of an apparently healthy and developing infant. There is no criminality at any level. The family did nothing that millions of new, loving, and struggling families don't do daily, except this time, their baby died during sleep for reasons science and medicine cannot explain. The tearing of this family fabric with the loss of a child and the resulting grief should not be compounded by incarceration, accusations, and criminal conviction.

[¶42] The district court found:

The autopsy report showed the following information: There was no evidence of foul play or recent significant trauma involved in S.B.'s death. At the time of her death, S.B.'s body was normally-developed, well-nourished, and well-hydrated. It was ultimately concluded that S.B.'s death was an "unexplained sudden death" and that her manner of death could not be determined.

The court noted the plea agreement and factual basis between the State and Black Elk were slightly different, but the court concluded that even with the slight difference, the autopsy report "does not support the conclusion that Ms. Black Elk's conduct affected S.B.'s physical health.

[¶43] In my opinion, the district court's findings and conclusion show the weight and quality of the newly discovered evidence, the autopsy report, and the report and testimony of the forensic pathologists, would likely result in an acquittal at trial as a matter of law. Black Elk met her burden to show a manifest injustice, and the court should have applied its discretion to allow withdrawal of her plea.

[¶44] Lisa Fair McEvers